CASE 89—PETITIONS AND INFORMATIONS—JUNE 1.

Commonwealth for use, &c v. Farmers' Bank of Kentucky.

Commonwealth for use, &c v. Bank of Kentucky.

Commonwealth for use, &c v. Deposit Bank of Frankfort.

Commonwealth for use, &c v. Frankfort National Bank.

Commonwealth for use, &c v. State National Bank.

City of Louisville, &c v. Bank of Kentucky.

City of Covington v. First National Bank of Covington.

City of Covington v. German National Bank of Covington.

Farmers' Bank of Kentucky v. City of Frankfort.

Farmers Bank of Kentucky v. County of Franklin.

Bank of Kentucky v. Armstrong, Sheriff.

Bank of Kentucky v. City of Frankfort, &c.

Deposit Bank of Frankfort v. Franklin County, &c.

Third National Bank v. City of Louisville, &c.

Louisville Banking Company v. City of Louisville, &c.

Northern Bank of Kentucky v. Bourbon County, &c.

Farmers' Bank of Kentucky v. City of Henderson.

APPEALS FROM FRANKLIN AND OTHER CIRCUIT COURTS.

1. EXEMPTION OF BANKS FROM MUNICIPAL TAXATION—IRREVOCABLE CONTRACT BY STATE.—The written acceptance by the various

banks of the State of the provisions of the Hewitt revenue law, under which they were to pay into the State Treasury a certain tax in full of all tax, State, county and municipal, constituted an irrevocable contract between the banks and the State, some of the banks having thereby surrendered the right which they had under their charters to pay into the State Treasury a still smaller rate of taxation in lieu of all other taxes; and therefore the banks which entered into that contract are exempt from taxation by the counties, towns and cities of the State, the provisions of the present revenue law authorizing such taxation being in violation of the provision of the Federal constitution that "no State shall pass any law impairing the obligation of contracts."

2. SAME.—The provision of sec. 6 of article 2, chapter 92, of the General statutes (the Hewitt revenue law), that "this act shall be subject to the provisions of sec. 8, chapter 68, of the General Statutes," which is known as the Act of 1856, and which authorizes the amendment or repeal of all grants to corporations, was not intended to authorize the legislature to divest contract rights acquired under the article in which that section appears, although the word "act" is used in the sense of article, there being a manifest distinction between the power of the legislature to repeal an act and the right to annul, by repeal or otherwise, a contract made under it, and it being besides expressly provided by the Act of 1856 that "no amendment or repeal shall impair other rights previously vested."

3. POWER OF STATE TO CONTRACT AS TO TAXATION.—While under our present constitution the State has no power to make such a contract, yet under the former constitution this power existed, and property might not only be classified in imposing taxation, but the State could discriminate between the classes when providing the rate of taxation.

HUMPHREY & DAVIE AND HELM & BRUCE FOR BANK OF KENTUCKY, THIRD NATIONAL BANK AND LOUISVILLE BANKING COMPANY.

1. Prior to the Hewitt act of 1886 the old banks (incorporated before 1856), had charter contracts, by which their taxes were commuted, and under which they could only be made to pay fifty cents on the $100; the National banks, under the Act of Congress, could not be taxed any higher than those State banks; and the new State banks (those incorporated since 1856), could not be taxed higher than the other banks, because it would be a violation of the constitutional requirement of uniformity and equality in taxation. (Franklin County v. Bank of Kentucky, 87 Ky., 370;

Commonwealth for use, &c v. Farmers' Bank of Kentucky.

Farmers' Bank v. Commonwealth, 6 Bush, 127; Covington City National Bank v. Covington, 21 Fed. Rep., 484; National Bank v. Paducah, 10 Ky. Law Reporter, 21; Lexington v. McQuillan's heirs, 9 Dana, 516.)

2. The Hewitt act of 1886 sought to accomplish two wise things: first, to obtain an agreement from the banks by which the revenue of the State would be increased by raising this tax commutation-contract from 50 cents to 75 cents on the $100; and, second, to produce and preserve that equality in the taxation of banking capital all over the State which is essential to prevent the financial institutions in one locality, where local taxation is light, from driving out those in cities where local taxation is many times heavier. To accomplish these things the act of 1886 proposed a contract with all the banks by which, "during the corporate existence of the banks," they would surrender their rights or claims to be taxed only 50 cents, and agree to pay 75 cents; and by which the State would agree, in consideration thereof, not to harass, cripple or destroy their usefulness by changes, or constant threats of changes, in the tax rates, as to them, "during the corporate existence of the banks." (Acts 1885-6, vol. 1, page 142.)

3. The Hewitt act of 1886 was, in express terms, a contract. It was "an agreement to and with the State of Kentucky" and the banks, made in the most solemn and deliberate manner, and evidenced in the most exact and contractual forms on both sides. It was binding on both alike, and could not be avoided by either. (New Jersey v. Yard, 95 U. S., 115; Knoop v. State of Ohio, 16 How., 369.)

4. The provision in the Hewitt act that "this act" shall be subject to the act of 1856 (which reserved the legislative right to repeal all acts), did not purport to reserve the right to the State to repudiate or violate the contract thus made under the "act," but only reserved the right in future to repeal the "act" itself, so as to prevent further contracts being made under it, after the repeal. The subsequent repeal of the act by the new constitution of 1891, did not affect the contract with the banks, made under it while it was in force; any more than the subsequent revocation of a power of attorney would invalidate deeds made under it, before its revocation. (Fletcher v. Peck, 6 Cranch, 135; Pac. Steamship Co. v. Joliffe, 2 Wallace, 450; Commonwealth v. Owensboro R., 95 Ky., 61; Sinking Fund v. Green R. Nav. Co., 79 Ky., 73; Gregory's Executors v. Trustees Shelby College, 2 Met., 598; Orr v. Bracken County, 81 Ky., 593.)

5. The extension of the charters of the banks from time to time did not destroy the identity of the corporations, nor create new and different beings; but the same beings, with the same identity,

characteristics, powers, contract-rights and vested rights, continued to exist, as before; and the commutation-contract with the State continued to exist as before. (Franklin County v. Bank of Kentucky., 87 Ky., 387.)

6. There was nothing in the Kentucky constitution which forbade the State from making that contract with the banks in 1886. To make a contract, for the valuable consideration of obtaining an increase of taxes, was not a violation of the constitutional provision that "all freemen, when they form a social compact, are equal and no man or set of men are entitled to exclusive, separate public emoluments or privileges from the community," etc. (Knoop v. State of Ohio, 16 How., 369; Farrigan v. Tennessee, 95 U. S., 682; Franklin Co. v. Bank of Kentucky, 87 Ky., 370; Commonwealth v. Whipps, 80 Ky., 272; Williams v. Kammack, 61 American Decisions, 513.)

7. If the State had the power to cancel this contract and resume its former position, the banks, also, would be restored to their former attitude; and their contract right to pay only 50 cents on the $100 would revive. Section 464 of the Kentucky Statutes, providing that when a "law" which has repealed a former "law," shall itself be repealed, it shall not revive the previous "law," does not prevent this revival; for, here, would not be the repeal of a "law" but merely the cancellation of a contract, by which a former contract had been suspended. (Louisville Water Co. v. Clark, 143 U. S., 1.)

8. These principles, and these contract rights of the banks, having been settled by repeated adjudications of this court, and large interests in the community having been built up in reliance upon these settled precedents, the doctrine of *stare decisis* should prevail. Nothing is so dangerous as a new departure in legal decisions; for, different from statutory changes, they are retrospective in their operation; and, "in matters of constitutional rights especially, it is the duty of the courts to keep the scales of justice even and steady, and not liable to waver with every new judge's opinion." (Orphan Asylum v. Tax Collector, 37 La. Ann., 68.)

D. W. LINDSEY FOR THE BANK OF KENTUCKY.

1. The agreement between the Commonwealth and the Bank of Kentucky under the Hewitt revenue law constituted an irrevocable contract, the consideration for the contract consisting in the waiver by the bank of the contract right which it had under its charter to a different mode and smaller rate of taxation. (Johnson v. Commonwealth. 7 Dana, 442; Farmers' Bank v. Commonwealth, 6 Bush, 127; Franklin County v. Bank of Kentucky, 87 Ky., 370.)

2. The insertion of sec. 6 of art. 2, of the Hewitt revenue law had no force whatever. Without that section the law would have been read as if the provisions of the act of 1856 were incorporated in it. (Griffin v. Ky. Ins. Co., 3 Bush, 592; Louisville Water Co. v. Clark, 143 U. S., 12; New Jersey v. Yard 95, U. S., 104.)

3. But reading the provisions of the act of 1856 as a part of the Hewitt revenue law, as must be done, they can not be regarded as indicating an intention upon the part of the legislature to reserve the right to abrogate the contracts it proposed to make with the banks. (New Jersey v. Yard 95, U. S., 104; Commissioners of Sinking Fund v. Green and Barren River Nav. Co., 79 Ky., 73; Commonwealth v. Owensboro &c. R. Co., 15 Ky. Law Rep., 455; s. c., 95 Ky., 60.)

4. If, however, the State can abrogate its contract with the Bank of Kentucky, the bank is restored to its contract rights which it agreed to surrender in consideration for the promise and pledge of the State now withdrawn. (Louisville Water Co. v. Clark, 143 U. S., 1.)

WM. GOEBEL FOR THE COVINGTON BANKS.

1. The repeal of a statute does not affect a contract made under its authority before the repeal. (Board of Sinking Fund Commrs. v. Green & Barren River Nav. Co., 79 Ky., 81-83; Railroad Companies v. Commonwealth, 15 Ky. Law Rep., 454; s. c., 95 Ky., 60; Orr v. Bracken County &c., 81 Ky., 593; Sage v. Dillard, 15 B. M.; Sinking Fund Cases, 99 U. S., 700.)

2. By the express terms of the proviso of the act of 1856 the contracts between the Commonwealth and appellees made under and in accordance with sec. 4, article 2, of the Hewitt revenue act are excepted out of the reservations of power to amend or repeal. (Board of Sinking Fund Comrs. v. Green & Barren River Nav. Co., 79 Ky., 83.)

3. It was the legislative intention to authorize the making of a contract by sec. 4, article 2, of the Hewitt act. (New Jersey v. Yard 95, U. S., 104.)

4. There was a consideration for the contract relied on by the banks. (State Bank v. Knoop, 16 How., 360.)

The General Assembly is the sole judge of the amount of consideration for any contract it makes or authorizes upon behalf of the State. (Barbour v. Board of Trade, 82 Ky., 645.)

JAMES W. BRYAN FOR SAME BANKS.

The revenue act of May 17, 1886, and the acceptance of its

provisions by the banks, constitute a contract which could not be impaired by any subsequent legislation of the State. (Act of Feb. 20, 1835, chartering Northern Bank of Kentucky; Act of 1834, chartering Bank of Kentucky; Act of Feb. 15, 1858, extending bank charters; Act of 1872, extending charter of Bank of Kentucky; Act of 1884, extending charter of Northern Bank of Kentucky; Act of 1850, chartering Farmers' Bank and Act of March 10, 1876, extending charter; Louisville Savings Bank &c. v. Commonwealth, 14 B. Mon., 329; National Bank Act of June 3, 1864; Act of Feb. 9, 1865, for taxation of banks; Commonwealth v. First National Bank of Louisville, 4 Bush, 98; sec. 8, chapter 68, General Statutes, known as "Act of 1856"; Franklin County &c., v. Banks, 87 Ky., 375; Farmers' Bank of Kentucky v. Greenup County, &c., 6 Bush, 127; City National Bank of Paducah v. City. of Paducah, 10 Ky. Law Rep., 222; The Fuqua Branch of State Bank of Ohio v. Knoop, 16 How., 368; State of New Jersey v. Yard, 95 U. S., 104; Farrington v. Tennessee, 95 U. S., 679.)

The reference in the Hewitt revenue act to the act of 1856 gave the Legislature no greater power to change that law or the contract under it than it would have had without such reference. (Griffin v. Kentucky Ins. Co., 3 Bush, 592; Greenwood v. Railroad Co., 105 U. S., 13.)

By the act of 1856 legislative control of all future statutes was reserved "unless a contrary intent be therein plainly expressed;" and it is expressly provided that "no amendment or repeal shall impair other rights previously vested." The legislature by the Hewitt revenue act has "plainly expressed" its intent that this contract should .continue during the corporate existence of the banks accepting it.

G. C. LOCKHART AND J. D. HUNT FOR NORTHERN BANK OF KENTUCKY.

The charter of the Northern Bank of Kentucky was an irrevocable contract with the State covering the questions in issue, and this irrevocable contract was continued in full force by the acts extending the charter. At the time of the enactment of the "Hewitt Law" this right of the bank was complete and extended during the life of its charter till May, 1905. Nevertheless, the bank did accept the "Hewitt Law" in good faith, believing that its enactment was intended to inaugurate a permanent legislative policy governing the taxation of the banks that should accept its terms, and to continue at least during the corporate existence of the assenting banks. Therefore, the Hewitt act and its acceptance was and is a contract binding on the State. But if the court should for any reason rule adversely on this submis-

sion the appellant submits that it is entitled to its charter rights
unimpaired. (Session Acts, 1834-5, p. 166; 1 Session Acts, 1857-8,
p. 55; 1 Session Acts, 1883-4, p. 552; Session Acts, 1835-6, p. 143;
1 Session Acts, 1885-6, pp. 144-147; Johnson v. Commonwealth,
7 Dana, 338; Farmers' Bank v. Commonwealth, 6 Bush, 128;
Franklin County v. Bank of Kentucky, 87 Ky., 370; Tennessee v
Whitworth, 117 U. S., 139; Humphrey v. Pegnes, 16 Wall, 244;
Smith on Contracts, 181; Chitty on Contracts, 44, 45; 1 Parsons
on Contracts, book 2, chap. 1, sec. 9.)

KNOTT AND EDELEN FOR STATE NATIONAL BANK OF FRANKFORT,
KENTUCKY.

·1. The State has no power under the national bank act, as construed
by the Supreme Court, to levy a tax on the assets of National
banks, their power being limited to a taxation on the *shares* and
to a taxation on the real estate of the bank. (McCulloch v.
Maryland, 4 Wheat, 316; Rev. Stats. U. S., secs. 5210, 5214, and
5219; National Bank v. Commonwealth, 9 Wall., 353; Rosenblatt
v. Johnson, 104, U. S., 462; Covington City National Bank v. City
of Covington, 21 Fed. Rep., 484; St. Louis Banks v. Papin, 4 Dil-
lon, 29; Smith v. Bank &c., 17 Mich., 479; City of Pittsburgh v.
First National Bank, 55 Pa., St., 45.)

2. No power exists without the consent of Congress—which has not
been given—to impose a tax on the franchises of national banks.
(California v. The Railroads, 127 U. S., 1.)

In Farrington v. Tennessee, 95 U. S., 679, the bank sought to
be taxed was chartered by the State of Tennessee.

FRANK CHINN FOR DEPOSIT BANK OF FRANKFORT.

The Deposit Bank of Frankfort had a valid exemption at the
time it accepted the provisions of the Hewitt law, and the sur-
render of this exemption by the bank was a sufficient considera-
tion to support the contract under which by the terms of that law
it was to be exempt from all other taxation. Besides, the amount
exacted by the State from the bank was nearly double that re-
quired of other tax-payers, which was a sufficient consideration to
support the contract. (Franklin County Court v. Deposit Bank
of Frankfort, 87 Ky., 370; Commonwealth v. Owensboro &c., R.
Co., 95 Ky., 60; Commissioners of Sinking Fund v. Green & Bar-
ren River Nav. Co., 79 Ky., 73; New Jersey v. Yard 95, U. S., 104;
Farrington v. Tennessee, 95 U. S., 679.)

JNO. W. RODMAN FOR FARMERS' BANK.

Commonwealth for use, &c v. Farmers' Bank of Kentucky.

WM. J. HENDRICK, ATTORNEY GENERAL FOR COMMONWEALTH.

1. The Bank of Kentucky (selected as the "most favored" of State banks), never had a contract with the State so far as exemption from taxation is concerned.

2. If it ever had one its validity and operation could not extend beyond the limit of its original charter. A renewal will not avail.

3. The claim made by the bank here is for a grant of a separate and exclusive privilege inhibited by the third section of the Bill of Rights, and the claim is also in violation of sec. 174 of the State constitution which requires uniformity of taxation and taxation according to value. (Holzhauer v. City of Newport, 15 Ky. Law Rep., 188.)

4. The doctrine of Trustees v. Woodward, 4 Wheat., so far as it declares that a charter is a contract was a fallacy to begin with, and is no longer recognized authority in this court or the Supreme Court of the United States on that point. (Chas. River Bridge v. Warren River Bridge, 11 Pet., 536; Richmond R. Co. v. Louisa R. Co., 13 How., 71; Railroad Co. v. Fuller, 17 Wall., 560; Chicago R'y Co. v. Iowa, 94 U. S., 115; Peak v. Chicago R'y Co., 94 U. S., 164-167; Union Pacific R'y v. United States, 99, U. S., 700; Stone v. Miss., 101 U. S., 623; Fertilizing Co. v. Hyde Park, 97 U. S., 659; Beer Company v. Mass., 97 U. S., 623; Powell v. Pennsylvania, 127 U. S., 678; Cov. & Cincinnati Bridge Co. v. Kentucky, 154 U. S., 204; Stone v. Farmers' Loan & Trust Co., 116 U. S., 636; Stone v. Ill. Cent., 116 U. S.; Delaware R. Tax Cases, 18 Wall., 206; Ga. Banking Co. v. Smith, 128 U. S., 174; Budd v. The People of New York, 146 U. S.; West River Bridge Co. v Dix, 6 How., 507; Thorpe v. Rutland R., 27 Vt., 140; Cov. & Lex. Turnpike Road Co. v. Commonwealth, 14 Ky. Law Rep.; Douglass v. Commonwealth, 15 Ky. Law Rep.; Chattaroi R. Co. v. Kinner, 81 Ky., 221.)

Cases in Kentucky in which Trustees v. Woodward has been followed: City of Louisville v. University of Louisville, 15 B. M., 642; Gregory v. Trustees Shelby Co., 2 Met., 589; Hamilton v. Keith, 5 Bush, 548; Wendover v. City of Lexington, 15 B. M., 258; L., C. & L. R. Co. v. Commonwealth, 10 Bush, 43; Commissioners of Sinking Fund v. Green & Barren River Nav. Co., 79 Ky., 73.)

5. On the question of repeal, general and special, consider: Sage v. Dillard, 15 B. M., 340; Griffin v. Ky. Ins. Co., 3 Bush, 592; Simpson County Court v. Arnold, 7 Bush, 353; C. & O. R. Co. v. Barren County, 10 Bush, 604; Orr v. Bracken County, 81 Ky., 593.

6. The government which creates corporations may reserve the power to destroy them or to prescribe the conditions upon which their future or continued existence shall depend. (Railroad Company

v. Maryland, 21 Wall., 471; McCulloch v. Maryland, 4 Wheat, 427; Providence Bank v. Billings, 4 Pet., 513; Bank of Commerce v. New York City, 2 Black, 620; Bank of Veazie v. Fenno, 8 Wall., 533; Turnpike Co. v. State, 3 Wall., 210.)

7. In the construction of charters in which a grant against common right is claimed, the affirmative must be shown beyond doubt or question. (Fertilizing Co. v. Hyde Park, 97 U. S., 659; Pennsylvania Co. v. Commissioners, 21 Pa. St., 9; Bank v. Tennessee, 104 U. S., 493.)

IRA JULIAN FOR COUNTY OF FRANKLIN, HUGH. RODMAN FOR CITY OF FRANKFORT, AND W. H. JULIAN FOR SAID COUNTY AND CITY.

1. The legislature having by the charters of the Deposit Bank and Farmers' Bank expressly reserved the right to repeal or amend those charters, there was no consideration as to those two banks for a contract under the Hewitt bill, even if those two charters were not subject to the provisions of the act of 1856.

2. The renewed charter of the Bank of Kentucky being subject to the provisions of the act of 1856, was not a contract, and the court is asked to review and modify the opinion in Franklin County Court v. Bank of Kentucky, 87 Ky., 376, in so far as it holds otherwise.

Where exemption from taxation exists it lasts only during the continuance of the charter, and unless *expressed* when the charter is renewed and extended the power to tax revives. (2 Houston's Rep., 121; 146 U. S., 294; Desty on Taxation, vol. 1, p. 142.)

Even if the legislature intended that the extension of the charter of the Bank of Kentucky should be a contract it was beyond its power to make such a contract at that time. (Lancaster v. Clayton, 86 Ky., 373; Tucker v. Ferguson, 22 Wall., 575.)

3. But whatever contract right of exemption from taxation the Bank of Kentucky may have possessed by virtue of its charter anterior to 1886, the same was waived and released by that bank's acceptance of the Hewitt Bill, including sec. 6 of article 2 thereof.

4. Neither the constitution of the United States nor any act of congress inhibits a State from taxing the property and franchises of National banks. (National Bank v. Commonwealth, 9 Wall., 353; Davenport Bank v. Davenport Board of Equalization, 123 U. S., 83; 18 Wall.; 5, 95 U. S., 19; 1 Thompson's Nat. Bank Cases, pp. 658 and 673.)

H. S. BARKER, CITY ATTORNEY OF LOUISVILLE.

1. The language granting exemptions from taxation is to be strictly construed: all doubts are to be resolved in favor of the State. (Cooley on Taxation, 2d edition, pp. 204-5; Tomlinson v. Jessup, 15 Wall., 454-7; Endlich on Int. of Statutes, secs. 354, 356.)

2. The fact that a contract gives to one party the exclusive right to terminate it at his pleasure does not rob the contract of the element of mutuality. (Griffin v. Ky. Ins. Co., 3 Bush, 592; Clark v. Louisville Water Co., 143 U. S.)

3. Sec. 6 of article 2 of the Hewitt law applies to the contract between the State and the banks. That section could not have been intended to apply to the gratuitous exemptions in sec. 9 of article 1, as the legislature had the right to withdraw such exemptions without the reservation of the right. (Cooley on Taxation, p. 69.)

4. If sec. 6 does refer to article 2 and the contract therein contained, the State has the power to withdraw from the contract. (Griffin v. Ky. Ins. Co., 3 Bush; Clark v. Louisville Water Co., 143, U. S.)

5. The immunity from taxation involved herein is not a *vested right* within the proviso of sec. 8, chapter 68, General Statutes. (Clark v. Louisville Water Co., 143, U. S.; Cumberland & Ohio R. Co. v. Barren County, 10 Bush, 606.)

6. If the Hewitt bill is repealed the banks whose charters ante-date the act of 1856 are not relegated to their original charters with reference to taxation. They voluntarily surrendered up their irrevocable contracts and made new ones which could be revoked. (Clark v. Louisville Water Co., 143 U. S.; Gen. Stats., chap. 92, art. 2, sec. 4.)

7. National banks may be taxed by the State just as other banks are taxed. (City National Bank of Paducah v. City of Paducah, 10 Ky. Law Rep. 221; Covington City Nat'l Bank v. Covington, 21 Fed. Rep., 484; 16 Am. & Eng. Enc. of Law, p. 190; Burroughs on Taxation, p. 127; Hilliard on Taxation, 248; Lionberger v. Rouse, 9 Wall., 468; Mercantile Nat'l Bank of New York v. Mayor of New York, 121 U. S., 138.)

CLIFTON ARNSPARGER AND RUSSELL MANN FOR BOURBON COUNTY.

W. C. P. Breckinridge and J. R. Morton for cities and counties, filed petition for rehearing, which was overruled.

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

The Bank of Kentucky, the Northern Bank, the Farmers Bank and other State banks, the National Bank of Covington and other national banks are in this court by their presidents and directors, some of them appealing from judgments imposing upon them taxation for county and munici-

pal purposes, and others standing as appellees in cases re-
lieving them from such local burdens.

The legislation imposing such burdens is found in the
Kentucky Statutes under the *title of Revenue and Taxation,*
and is based on secs. 174 and 175 of the present constitution.

Sec. 174 provides: "All property whether owned by
natural persons or by corporations, shall be taxed in propor-
tion to its value, unless exempted by this constitution, and
all corporate property shall pay the same rate of taxation
paid by individual property. Nothing in this constitution
shall be construed to prevent the General Assembly from
providing for taxation based on incomes, licenses or fran-
chises."

Sec. 175 provides: "The power to tax property shall not
be surrendered or suspended, by any contract or grant to
which the Commonwealth shall be a party."

It is manifest by reason of sec. 175 the right of the leg-
islature no longer exists of surrendering the power to tax
property, or by contract to bind the State to any other mode
of taxation than that found in the constitution, and all
property, whether belonging to corporations or individuals,
must pay the same rate of taxation.

The appellants in these cases (the banks) are claiming that
prior to the adoption of the present constitution a contract had
been entered into between them and the State, by which, in
consideration of the surrender by them of certain rights
found in their respective charters, and by their consent and
agreement to pay a larger State tax than individuals paid,
or their charters required, the State agreed not to impose
upon them any local burdens, and the important inquiry
in these cases is: Was such a contract entered into between
the banks and the State based on a consideration, binding
the State on one side and the banks on the other?"

The statute under which this contract is claimed to have been made is found in the General Statutes under the title of revenue and taxation, secs. 1 and 4, of art. 2, and known as the Hewitt bill. Counsel for the banks in the discussion of these cases classified the banks as follows: 1. The banks chartered prior to the act of 1856, when the power to amend or repeal was not a part of the charter or reserved by any general law. 2. Banks chartered after that date, when by a general law the right to amend or repeal the charter was expressly reserved. 3. The national banks. We shall treat all the cases as one in considering the application of the Hewitt act to the banks accepting its provisions.

Prior to the adoption of the present constitution it seems to have been the settled policy of the State to exempt banking institutions from local taxation, and requiring them to pay a larger tax to the State upon its property than that paid by the individual tax-payer, and this additional tax went into the State Treasury instead of being applied to municipalities in the discharge of local burdens. The framers of the constitution, not approving of this policy, established a fixed rule of taxation and made all taxation alike upon property, whether for State or municipal purposes, applying the rule for municipal purposes to the territory in which the tax is imposed. It is argued, and no doubt true, that a discrimination must exist between banks located where heavy local burdens are imposed, and like institutions in more favored localities, where lighter or no local burden exists, and while the fact that the banks in the commercial centers of the State are taxed two and a quarter dollars on the hundred, under the present system (local and State), and those in an adjoining town or county only one per cent., may work a hardship, and prevent competition, or drive

the banks thus heavily taxed to locate elsewhere, yet this, under the old system, was a question of policy only, and the framers of the present constitution, in adopting the ad valorem system, left no room for classifying property, so as to make any discrimination in the subjects of taxation, and the suggestion of counsel can only be considered in determining the intent of the legislature in passing the Hewitt act and that of the banks in accepting it.

It may be well however to ascertain the condition of the banks (and particularly those chartered before the year 1856), with reference to taxation, and the circumstances attending the legislation resulting in the passage of the Hewitt bill, in order to ascertain whether or not it was the purpose of the State to surrender in part its power of taxation, and that of the banks to relinquish any right they could have asserted against the State by reason of their charters. The banks in existence prior to the act of 1856 were claiming their charter contracts by which only a tax of fifty cents on each share of one hundred dollars of stock could be imposed.

The national banks claimed they were entitled to be taxed like the State banks, and were not liable for local burdens, and besides, that their surplus, if in greenbacks or other non-taxable securities, could not be taxed under their charters from the Federal Government.

The State claimed the old banks were taxed for too small an amount, and the banks chartered since the year 1856 were resisting any discrimination between such institutions and the old banks. Under these circumstances the legislature devised a mode of taxation that prevented a discrimination that would otherwise exist, and by the provisions of the Hewitt bill said to all the banks, State and national, we will impose a tax of seventy-five cents on each share of

your capital stock equal to one hundred dollars, and in addition a tax on your surplus, and this shall be in full of all tax, State, county and municipal, provided you will accept the act imposing the tax with the conditions annexed.

This act reads: "Shares of stock in State and national banks and other institutions of loan and discount, and in all corporations required by law to be taxed on their capital stock, shall be taxed seventy-five cents on each share thereof, equal to one hundred dollars of stock therein, owned by individuals, corporations or societies, and said banks, institutions and corporations shall, in addition, pay on each one hundred dollars of so much of their surplus, undivided surplus, undivided profits, or undivided accumulations, as exceeds an amount equal to ten per cent. of their capital stock, the same rate of taxation that is assessed upon real estate, which shall be in full of all tax, State, county and municipal." The seventh section of the act further providing that "nothing herein contained shall be construed as exempting from taxation for county or municipal purposes any real estate or building owned and used by said banks or corporations for conducting their business, but the same may be taxed for county and municipal purposes as other real estate is taxed."

Section 4 of this act provides: "That each of said banks,. institutions, and corporations, by its proper corporate authority with the consent of a majority in interest of a quorum of its stockholders at a regular meeting thereof, may give its consent to the levying of said tax, *and agree* to pay the same as herein provided, *and to waive and release all right under the act of Congress*, or under the charters of the State banks, to a different mode *or smaller rate of taxation*, *which consent or agreement with the State of Kentucky* shall be evidenced by writing under the seal of such bank, and

delivered to the Governor of this Commonwealth, *and upon such agreement and consent being delivered and in consideration thereof,* such bank and its shares of stock shall be exempt from all other taxation whatsoever, so long as said tax shall be paid, during the corporate existence of such bank."

Section 5 of this act provides: "The said banks may take the proceedings authorized by sec. 4 of this act, at any time, until the meeting of the next General Assembly: *Provided,* they pay the tax provided in sec. 1, from the passage of the act."

Section 6 provides: "This act shall be subject to the provision of sec. 8, chap. 68, General Statutes."

The banks involved in this litigation accepted in writing the provisions of the act and filed their written acceptance with the Governor under their corporate seals. The banks incorporated before the act of 1856 surrendered what they claimed to be their charter contracts, by which they were taxed only fifty cents on their shares of stock of one hundred dollars. The national banks yielded their right to deduct from the value of their stock their surplus consisting of non-taxable securities, and their claims to be taxed as the old banks, and most of the State banks uniting to prevent any discrimination, all accepting the proposition made by the State and agreeing to pay seventy-five cents on each share of stock of one hundred dollars in value, and the additional tax mentioned in the article.

It is conceded by counsel for the city of Louisville (and we think it clear) that prior to the passage of the Hewitt bill, in the year 1886, the Bank of Kentucky had an irrevocable contract to be taxed at the rate of fifty cents on each share of one hundred dollars, and the same may be said of all the banks chartered prior to the act of 1856; but it is

further contended that the act, as well as the contract under
it, were both subject to repeal by reason of the reserved
power contained in sec. 6 of art. 2. Again it is contended
by counsel for the city of Frankfort that the grant to the
banks was without any consideration, and the renewals of
the charter of the old banks, as they are designated, placed
them within the provisions of the act of 1856, and by the at-
torney-general that the State had no power to surrender
this right of taxation, and the contract, if made, is not bind-
ing.

This court, in the case of the Franklin County Court
v. Bank of Kentucky reported in 87 Ky., 370, in an
opinion delivered by Chief Justice Bennett, held that the
renewals of those charters did not affect the contract made
with the State under the original grant, and if disposed to
reconsider the decision rendered in that case, it could not af-
fect the issue involved on the present appeals. At the date of
the passage of the Hewitt bill the Franklin Circuit Court had
decided that the charter contract still existed, and after the
acceptance by the banks of the provisions of the Hewitt bill
that court affirmed that judgment. It is apparent that
art. 2 in the Hewitt bill was adopted by the legislature
with a view of equalizing the burdens of taxation as be-
tween the banks and to relieve them from the burden of local
taxation during their corporate existence, but it is insisted
there was no consideration for this partial exemption.

If there was a binding contract between the *old banks* and
the State to pay a tax of only fifty cents on each share of
stock, and these banks surrendered their contract, or their
right under it, and agreed to pay seventy-five cents to the
State instead of forty-two and one-half cents, it seems to
us this would be a wise consideration, sufficient to uphold
any such contract with the State, if the power existed with

the State to make it, and the fact that such a power existed has been too often decided by this court, as well as the Supreme Court, to require authority in support of it. It is plain also that these banks, including the national banks, surrendered their rights, not only to settle the question as to local taxation, but to prevent competition or any discrimination between banks located in the commercial centers of the State and those outside of such localities, while no heavy burdens for local taxes were being levied, and therefore the consideration moving from the old banks was for the benefit of all the banks accepting the terms of the contract. The legislature was attempting to avoid all discrimination between these monied institutions and, therefore, its exactions from the old banks and the national banks being acceded to, it resulted to the benefit of the banks organized after as well as before the act of 1856, as to such banks uniting with the old banks in accepting the Hewitt bill. In this statute, imposing the tax of seventy-five cents and its acceptance on the conditions proposed, there exists every element of a contract between the State and the banks, and with such a consideration as will uphold it, no reasonable doubt can be entertained that such was the purpose of the parties to it.

It is contended that if a contract was entered into, the provisions of the present constitution, and subsequent legislation under it, operated to repeal not only the statute, but the contract made by virtue of its provisions, and this power existed by reason of the sixth section of the article, making it subject to the provisions of sec. 8, chap. 68, General Statutes, declaring that this "shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be plainly expressed: *Provided*, That whilst privileges and franchises so granted may be changed

or repealed, no amendment or repeal shall impair other rights previously vested."

Assuming, and as we think was the legislative intent, the word *act* in section 2 of the Hewitt bill was used as synonymous with the word *article*, and, therefore, the reservation of the power on the part of the legislature was the right to amend or repeal the article in which is contained the proposition by the State to the banks, in reference to taxation, it by no means follows that a contract made by virtue of its provisions can be abrogated at the will and pleasure of the legislature. The distinction between the power of the legislature to repeal an act, and the right to annul by repeal or otherwise a contract made under it, is manifest, and while under our present constitution the State can make no contract, by which the exercise of the taxing power can be lessened or any part of its sovereign power in that regard relinquished, under the former constitution property might not only be classified in imposing taxation, but the State could discriminate between the classes when providing the rate of taxation, and this doctrine has been recognized by numerous decisions of this court and sustained in like cases by numerous decisions of the Supreme Court.

The general rule in regard to legislation is, that one legislative body can not bind a subsequent legislature to its action in purely legislative matters, but when it comes to matters of contract, if the State has the power to make it, its terms and conditions are as obligatory on the State as if entered into between two of its citizens, and an attempt to cancel such a contract, without the consent of the party with whom it is made, is in direct violation of that clause of the Federal Constitution providing that "no State shall . . . pass any law impairing the obligation of contracts." (Sec. 10, art. 1, U. S. Const.)

That the State may enter into such contracts was held by this court as early as the year 1839, in the case of Johnson v. Commonwealth, reported in 7 Dana, 342, where there was an effort to tax the shares of stock in a bank, in excess of the terms of the contract, and this court held that the contract placed a limitation on the power.

In the case of the Farmers' Bank v. Commonwealth, reported in 6 Bush, 127, it was held the bank could not be taxed beyond its charter rate, as fixed by the contract, and in the late case of the City of Frankfort v. The Bank of Kentucky, and others, reported in 87 Ky., 370, the same doctrine was announced.

The question then arises: Did the reservation of the power to amend or repeal this article of the Hewitt law empower the legislature, or the framers of the constitution, to disregard this contract between the banks and the State? We are satisfied, after a careful consideration of this question, that the parties making it never contemplated or intended that the act of 1856 should apply to this contract after its acceptance by the banks, and that such an acceptance was necessary to make the contract complete between the parties. The legislature, at the time this contract was made, recognized the right of the Bank of Kentucky, and the banks chartered prior to 1856, to stand upon their charter rights, or if not the right of the banks as against the State on this subject of taxation had found its way to the courts, and had been decided adversely to the State. The legislature thought the tax of fifty cents too small. The old banks claimed an irrevocable contract. The national banks could only be taxed as authorized by the federal congress. The new State banks were subject to such taxation as the State might see proper to place upon them, and to make them liable for these local burdens would be

to end their existence, or cause them to seek shelter under
the Federal banking act, and with a view of placing the en-
tire matter at rest, and placing the banks on an equal foot-
ing, the legislature said to all of the banks: "If you will
agree to pay seventy-five cents on each share of stock equal
to one hundred dollars, etc., it shall be in full of all tax,
State, county and municipal." It said to the old banks:
"You must relinquish your right to a smaller rate of tax,
and this must be done, not by your president and directors,
but by the consent of the stockholders, in writing, and de-
livered to the Governor as evidence of your good faith." The
banks accepted the proposition made them in the manner
pointed out by the act, and from that time to the adoption
of the present constitution, the contract was adhered to by
both the State and the banks. It is now argued the banks,
and particularly those with charter contracts for a smaller
rate of taxation, surrendered those charter rights and
agreed to pay a higher rate of tax under an act that author-
ized any subsequent legislature to repeal the contract at
its will and pleasure. No rational view of this agreement
should lead to the conclusion that business men at the head
of these institutions would relinquish every right they had
acquired under their charters, that an increased burden
might be placed upon the banks they represented.

In the contention that the sixth section of the article re-
serves this power of repeal, counsel overlook the fact, that
by the express terms of the section by which this reserved
power is retained, it is provided that *"no amendment* or re-
peal shall impair other rights previously vested." The ex-
ecution of the agreement between the State and the banks,
based on a consideration such as appears from the act
itself connected with its acceptance by the banks, vested in
the latter rights of which they could not be divested with-

out their consent, the chief of which was the payment of a specified tax to the State during their corporate existence.

The State waived its right to tax these banks for local purposes (except their realty), and required in lieu thereof an additional tax to be paid into the State treasury. In this way the State granting the franchise derived the benefit instead of the municipal government, while under the present system, the difference between forty-two and one-half cents and seventy-five cents, with tax on surplus amounting to one hundred and twenty-five thousand dollars, is taken from the revenue proper, and applied to the municipalities where the banks are located.

In the case of Commissioners of Sinking Fund v. Green & Barren River Navigation Company, reported in 79 Ky., 73, this court held, with the act of 1856 in full force, that the State had no power to annul a contract that had been executed between the State and the company, and that the repeal of the charter to the extent it deprives the company of its contract rights acquired under it was in violation of the constitution. In that case the court said: "We can not assent to the doctrine that will allow the State to alter or abolish such contracts, whenever, in the opinion of the legislature, the necessities of the public or the interest of the State require it."

The case of The Commonwealth v. Owensboro, &c., R. Co., 95 Ky., 60, determines in effect the question involved here. In the year 1884 the legislature passed an act to encourage the construction of railroads, and in doing so relieved them from taxation for a limited period. The act provided: "That all railroads which may hereafter be built within this Commonwealth under existing charters, or under charters which may hereafter be granted, shall be exempt from all taxation under the laws of this Common-

wealth for the period of five years, from the date of the be-
ginning of the construction of the new roads."

The State claimed the right under the act of 1856 to re-
peal the law, claiming this had been done by legislation, as
in the case before us, and attempted to coerce payment of
taxes, when the five years from the beginning of the con-
struction of these roads had not expired.

The court, in response to the argument to exact the tax,
and the application of the act of 1856 to its provisions, said:
"It is sufficient to say of this proposition, which even at
first blush strikes us as extraordinary and unjust, if at-
tempted to be applied to those of the appellees who accept-
ed the offer of the State, and expended their money on its
exemption pledge, that the act of 1856, reserving the right
to repeal or amend charter privileges granted by the legisla-
ture to particular persons, has no application to the law of
1884, which, as said before, was a general law and affected
all alike who accepted its provisions or acted on the strength
of them."

Counsel for the local governments argue the questions in-
volved as if there was a perpetual grant to these corpora-
tions, and, therefore, the power of repeal must of necessity
have been reserved. The limitation of the grant extends
to the life of the corporate charter, and with the banks
existing prior to the act of 1856 their charters expire in
ten or twelve years, and hence the policy of the State, if
viewed in that light, was wise, because it was increasing
the State revenue from fifty to seventy-five cents for a fixed
and certain period.

The framers of the constitution in adopting that instru-
ment were not looking to past legislation on this particular
subject, but were creating an original law for the future
welfare of the State, leaving the rights of those protected

by either the State or Federal constitutions undisturbed,. and if the attempt to repeal vested rights had been made, the framers of the present constitution would have been as powerless to accomplish such a purpose as the legislature in session after its adoption.

The Supreme Court decided a somewhat similar question on a writ of error to the Court of Appeals of New Jersey, in. the case of New Jersey v. Yard, reported in 95 U. S., 110.. By an act of the legislature, passed in March, 1865, the legislature of New Jersey enacted that the Morris & Essex Railroad Company should pay a tax of one-half of one per cent., to be paid by the company to the State whenever the net earnings of the company amount to seven per cent. on. the cost of the road, to be paid at the expiration of one year from the time when the road shall be open, and in use to Philipsburg, and annually thereafter, *which tax shall be in lieu and satisfaction of all other taxation and imposition whatever, by or under the contracts of this State.*

The twentieth section of the original act of incorporation reserved to the legislature the right to alter, amend or repeal the act whenever it should think proper. The act of 1865 was an amendment to the original grant and in regulating the amount of taxation contained this proviso: *"Provided,* That this section shall not go into effect, or be binding on the company, until the said company, by an instrument duly executed under its corporate seal, and filed in the office of the Secretary of State, shall have signified its assent thereto, which assent shall be signified within sixty days after the passage of this act, or this act shall be void."

Chief Justice Miller in delivering the opinion in that case said: "The main question here is, did the legislature intend to make such a contract," and held that "its meaning and its

terms are clear enough, and, taken alone, no one denies but that it is a contract which would be protected by the constitution of the United States." And in like manner will the contract in question be upheld.

And as said by Mr. Justice Miller in New Jersey v. Yard: "The legislature was not willing to rest this contract in the usual statutory form alone, depending on its validity as a contract upon some action of the corporation under it to bind it to its terms; but they required of the company a formal written acceptance within sixty days, else it became wholly inoperative." And it may be said in the New Jersey case there was no consideration other than is found in ordinary railroad charters.

It is said, however, in that case, the repealing clause, or what is known in this State as the act of 1856, was appended to the original charter, and when amended it formed no part of the amendment, as is found in this case, and, therefore, the court concluded the amendment was not subject to repeal.

The question is asked, why the necessity of making the act of 1856 apply to article 2, if the legislature did not intend to reserve the right of annulling the contract? In response to this it might be asked, if such was the legislative intent, why the necessity of having a formal written acceptance from the banks surrendering all their respective charter rights, and in consideration therefor agreeing to tax them seventy-five cents on the hundred dollars, so long as their charters continued, if the power was reserved of abrogating the contract at any moment. If such was the legislative purpose there could have been no necessity for any consideration moving from the banks, or any formality attending the execution of the contract.

The act of 1856 was enacted to avoid the effect of the de-

cision of the Supreme Court in the Dartmouth College case,
reported in 4 Wheat, 518, to enable the sovereign power to
amend and repeal charter provisions that had theretofore
been regarded as beyond the power of the legislature, with-
out such a reservation, but under this act of 1856, it has
been held by this court, as well as every other court hav-
ing the question before it, that property rights or contract
rights, acquired by virtue of the charter in exercising the
privileges conferred, could not be interfered with by legis-
lation, and, in fact, the act expressly provides "that whilst
privileges and franchises so granted may be changed or re-
pealed, no amendment or repeal shall impair other rights
previously vested."

The old banks had contract rights sustained by the ad-
judications of the courts of the State that exempted them
from local taxation, and the same adjudication was had in
regard to national banks, although the cases as to the na-
tional banks were decided subsequent to the passage of the
Hewitt bill.   (City National Bank of Paducah v. The City
of Paducah, 10 Ky. L. R., 221; Covington City National Bank
v. City of Covington, 21 Fed. Rep., 484.)

The legislature saw the obstacle in the way of increasing
the taxation on these banks, and the national banks, stand-
ing on the same footing with State banks, it became ap-
parent that it was to the interest of the State to hold out
inducements to all the banks, that equality as between them
might exist, and at the same time increase the taxation.
The banks had not asked for any amendments to their
charters, nor was the effort made by the legislature to re-
peal or amend the charters.   The State was attempting to
enact a general law, entitled *Revenue and Taxation*, applying
to all subjects of taxation, and to all kinds of property. The
tax in regard to banks, under this general title, was fixed

at seventy-five cents as to all banks, *and as to all corpora-tions*, required by law to be taxed on their capital stock, and as to the old banks and the national banks, the surrender of these rights was made to depend upon their acceptance of the proposition made to them by the State, by the terms of which they were to pay the tax imposed by the Hewitt bill, and be released from other taxation, so long as their charters continued.

Why, then, did the legislature annex to *article 2*, of the revenue bill, the provisions of the act of 1856? No con-tract had been made when the bill passed, as there had been no acceptance by the banks, and not until the adjourn-ment of the legislature was the contract consummated. It was provided in article 2 that the acceptance had to be made before the legislature again assembled, and the act of 1856 could only have authorized the reservation of power to repeal or withdraw this proposition, if, within the period fixed, there was no aceptance by any of the banks of its pro-visions.

The right to the franchise or the exercise of the privileges granted was not involved in the legislation, but the banks, with their charters in full force, were asked by the legisla-ture to make an agreement as to a rate of taxation, that could not have otherwise been enforced against either the old banks or the national banks.

The corporations had the right to contract by reason of their charters, and, dealing at arm's length with the State, accepted the terms and conditions offered in good faith, and the question here is, not the right of the State to repeal or amend their charters, but the right of the State to cancel this contract without the consent of the banks."

The right of the State to repeal the franchise, or amend the charter, is not here questioned, when subject to the act

of 1856, but the repudiation of a contract will not be sanctioned.

There was, in fact, necessity for the State to apply the act of 1856 to article 2. Other corporations, as well as banks organized since 1856, were liable to this tax, whether they accepted the provisions of the Hewitt bill or not; and section 4 was inserted for the express purpose of creating a contract between the old banks and the national banks on the one side, and the State on the other, by which the taxation on these banks might be increased, and, at the same time, placing all the banks accepting its terms on the same footing. If no acceptance had been made there was no reason why the act could not have been enforced as against these corporations coming within the act of 1856, but neither the banks nor the State ever intended to perform such an idle act as entering into this solemn agreement that might be disregarded by the State whenever its representatives saw proper.

The rule is, if a statute is susceptible of two constructions, that which is consistent with public policy will be followed, and no meaning given a statute that will lead to an absurdity.

The case before us is much stronger for the banks than that of New Jersey v. Yard. Here, the old banks had contract rights sustained by the adjudication of the courts of the State, to the effect that they were not liable to local taxation, and the same adjudication followed in reference to national banks. The contract was not only executed, but based on a valuable consideration. If there were any doubt as to its meaning, that doubt would be construed for the State; but when considering the entire article, the intention of the legislature, it seems to us, is manifest. This increased tax, under the former constitution, as

before stated, went to the State, and not to the municipalities. Such was the policy of the State when the contract was made, and we perceive no reason for abrogating its terms, so as to withdraw from the State treasury this additional tax the banks have been paying amounting to $125,000 annually, and transfer it to the cities to aid in discharging local burdens.

It requires no judicial utterance to show that, under the national banking act, where the rate of interest is fixed at six per cent. (or as the State law provides), and a forfeiture of the entire interest if more is charged, that these banks, by the imposition of local burdens, can not be taxed as much as two and one-half per cent. in any locality, when the average taxation of State banks will not exceed half that sum.

In the case of Lionberger v. Rouse, reported in 9 Wall., 468, after the national banking system went into effect, the legislature of Missouri passed a law authorizing the banks of issue in that State, ten in number, to enter into the new system. Eight of those banks became national banks, and two of them declined to do so. The two old banks, as the Supreme Court of the United States held in that case, had a contract right with the State not to be taxed exceeding one per cent., and the State was powerless to increase this tax. The assessment of the plaintiffs' shares of stock in the national bank was at the rate of nearly two per cent. It was contended that this was an unjust discrimination in favor of the two State banks, and the Supreme Court said, as the national bank, or its shares, was not taxed for a greater sum than other moneyed institutions of the State, and the State was powerless to change its contract with the two remaining banks of issue, it was not such a discrimination as would authorize the court to interfere.

While there are exceeding *sixty* State banks, the Bank of

Kentucky and its branches, the Northern Bank and its branches, the Bank of Louisville, and the Farmers Bank of Kentucky and its branches were, at the time of the passage. of the Hewitt bill, and are now, regarded as the prominent banking institutions of the State, and if, with their capital and business rank placed before the Supreme Court with a tax of only one per cent., and the tax on the national banks placed at two per cent., the judgment of the Supreme Court upon such a state of fact, doubtless, would have been similar to the decision of the court in the case of the National Bank v. The City of Paducah, 10 Ky. L. R., 221.

The case of Lionberger v. Rouse, 9 Wall, 468, has no bearing on this question of contract. Here the State was not powerless to remedy the evil, or prevent the discrimination complained of in the Missouri case. The legislature devised a mode by which this discrimination could be removed, however great, or even insignificant, the difference in taxation might have been. The national banks recognizing the fact they could be taxed as other moneyed capital, and desiring uniformity of taxation, and not one rate for one bank, and a different rate for another, surrendered their right, or claim, to be taxed as the old banks were taxed, and entered into this agreement by which a uniform system of taxation was adopted for all banks, such as the State desired.

The claim of the old banks and the national banks, as to the mode of taxing them, was, certainly, not without foundation, for the reasons already given, and the proposition by the legislature to settle these differences, and its acceptance, was a wise and just solution of the whole question.

The case presented by this legislative repeal is the opposite of the legislation in the Missouri bank cases. In the one case there was no legislation making the discrimination, while in the case before us, the State, after placing

the banks, State and national, on the same footing as to taxation, by the consent and agreement of all the parties to the contract, is now insisting upon a legislative rescission of the contract, and placing the old banks at least in a position where they are to pay only fifty cents on the shares of a hundred dollars, and leaving the national banks subject to a greater rate of taxation.

This repeal, if sustained, is in effect the creation of three or more new banks with a rate of taxation much less than that imposed on the national banks, and making a discrimination in favor of the old banks and their branches that gives them a monopoly of the banking business of the State.

The old banks, with a capital of five millions, at the time the Hewitt bill passed, will be relegated to the condition they were when the contract was made, as was held by the Supreme Court in the case of The Water Company v. Clark, reported in 143 U. S., 1, and that is *an exemption* from local burdens, with a tax of one-half of one per cent. to the State. The national banks, with a capital of ten millions when the Hewitt bill was enacted, and now increased to twenty millions, will also be exempt from local burdens, because the State, in the exercise of the power it now claims, has abandoned the contract under which taxation was equal and uniform, and voluntarily made an unjust discrimination, when in its power to prevent it. Such consequences would be disastrous to both the State and the municipalities, the State losing the increased tax, and the municipalities (or the legislature for them) without power to impose on national banks local burdens.

The banks have all, practically, accepted the provisions of the Hewitt bill, and the legislation repealing or canceling the contract, being in violation of both the State and Federal constitutions, leaves the Hewitt bill, as to the banks,

in full fórce, and they must be taxed under its provisions, until the contract terminates.

These moneyed institutions are now paying, including tax on surplus and realty, eighty cents, or about that sum, on each share of stock of one hundred dollars, while the citizen tax-payer is paying only forty-two and one-half cents, and at last it is a question whether this difference in the taxation is to be paid by the banks into the State treasury, as under the old constitution, or to the municipalities, under the new constitution.

In the absence of this contract it would go to discharge local burdens, but with this contract in full force, it must be paid, as to the amount and manner, as provided by the Hewitt bill of 1886, into the treasury of the State.

It results, therefore, that the judgments in the case of the Louisville Banking Co. v. City of Louisville, Third National Bank v. City of Louisville, Northern Bank of Kentucky v. Bourbon County, Deposit Bank v. Franklin County, Bank of Kentucky v. Armstrong, Bank of Kentucky v. City of Frankfort, Farmers Bank v. City of Frankfort, Same v. Franklin county, and Same v. City of Henderson are reversed; and the City of Louisville v. Bank of Kentucky, Commonwealth v. State National Bank, Same v. Frankfort National Bank, Same v. Deposit Bank, Same v. Bank of Kentucky, City of Covington v. German National Bank, Same v. First National Bank, and Commonwealth v. Farmers Bank are each and all affirmed.

JUDGE PAYNTER DISSENTING:

Were this a case simply affecting the rights of two citizens of the State, I might content myself with dissenting, without expressing my reasons therefor, but involving as it does the sovereignty of the people, and denying to them, as

I conceive it does, the right to have their will to assume the form of law, on such a vital question as that of taxation, and their right to demand and enforce equal and just taxation, I feel constrained to give my reasons for dissenting from the views expressed by the court.

The effect of the opinion of the court is to destroy a principle engrafted in the laws of this State nearly forty years ago. One so important that it was declared by the General Assembly to be in effect written in every act of incorporation granted by it. So important was the reservation of the right to amend or repeal all acts of incorporation that the General Assembly was unwilling to run the risk of inserting it in each act, but declared, by general law, that it should be understood to be written in all of them.

The opinion, in effect, denies the power of the people, through their organic law, to declare what are just principles of taxation, that the same rate of taxation shall be imposed on the property of corporations as on an individual, and the authority of the General Assembly to execute that constitutional mandate. I believe that corporate rights should be held as inviolate as those of the citizen; that each citizen should bear his full share of the common burden of taxation; "that all freemen, when they form a social compact, are equal; and no man or set of men are entitled to exclusive, separate public emoluments or privileges from the community, but in consideration of public services."

I do not believe in the State passing laws impairing the obligation of its contracts with corporations or individuals when the contracts are made by virtue of the provisions of the constitution. Nor do I believe in denying the right to the State to withdraw from a contract when, in express terms, the right to do so is reserved, as in such case it can not be said to impair the obligation of the contract.

While I regard there is a vast difference between granting a corporate franchise authorizing the acquisition of property, by donation and otherwise, for the purpose of educating and spreading the gospel among the Indians, and affording an opportunity to the youth of the land in the days of the early settlement of the country to obtain an education, as was the purpose of the charter to Dartmouth College, and granting immunity from taxation to institutions operated solely for private gain, yet, as the courts of the country, taking the principle enunciated in the Dartmouth College case as authority therefor, have held that immunity from taxation granted in the act of incorporation is a contract with the State, and is irrevocable, unless the right to revoke is reserved in the act of incorporation, or in a general act, which must be treated as part of the act of incorporation, in considering these cases I shall accept that as the rule to govern in the determination of the questions involved. Indeed, it is unnecessary to take any other view of the law in order to reach the conclusion which I have done in these cases. However, I can not forbear quoting what Justice Miller said in delivering the opinion of the court in New Jersey v. Yard, 95 U. S., 114, to-wit: "The writer of this opinion has always believed, and believes now, that one legislature of a State has no power to bargain away the right of any succeeding legislature to levy taxes in as full a manner as the constitution will permit. But, so long as the majority of this court adheres to the contrary doctrine, he must, when the question arises, join with the other judges in considering whether such a contract has been made."

I agree with Justice Miller that in the matter of taxation one legislature of a State has no power to bargain away the right of a succeeding legislature to levy taxes in as full a manner as the constitution will permit. Such a power could

be exercised to such an extent as to almost destroy the gov·
ernment, or to grievously burden one class of its citizens.

Instead of having the Dartmouth College case under
consideration, had Chief Justice Marshall had a case coming
from Kentucky, wherein it was claimed the legislature had
sought to impair the obligation of a contract it had made
with one of the old banks, by passing a statute providing it
should pay an amount of tax in addition to that specified
in its charter, I can not believe, in view of the constitutional
provision prohibiting the granting of exclusive privileges
except "in consideration of public services," he would have
held the bank had an irrevocable contract with the State.

From the Dartmouth College case to the present time
(and the right was in that case recognized), the Supreme
Court of the United States has uniformly held that wherever
the legislature granting the charter reserved the right to
amend or repeal it, either by so providing in the charter or
by a general law, the right to amend or repeal such charter
exists, and to do so is not to impair the obligation of a con-
tract, the charter being accepted with the full understanding
that the right of repeal is part of the contract, and to the
exercise of which right the grantee has consented.

Many of the States, after the Dartmouth College case,
began to realize the importance of reserving the right to
control corporate organizations, which, from time to time,
were being created, and to make sure that such power was
being reserved, they passed general laws expressly reserv-
ing such power, which statutes became a part of every act
of incorporation as fully as if written therein, unless a dif-
ferent purpose was therein plainly expressed.

The legislature of this State, being fully aware of the im-
portance of such action as would reserve the right to amend
or repeal acts of incorporation, passed what is known as

the statute of 1856, which is sec. 8, chap. 68, General Statutes.

It reads as follows: "All charters and grants of or to corporations, or amendments thereof, executed or granted since the 14th of February, 1856, *and all other statutes*, shall be subject to amendment or repeal, at the will of the legislature, unless a contrary intent be therein plainly expressed: *Provided*, That whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested."

It seems so plain that charters and grants, since the 14th of February, 1856, are subject to amendment or repeal at the will of the legislature, unless a contrary intent is plainly expressed therein, that it is needless to discuss it. The Supreme Court of the United States has not only so held, but this court has done likewise in every case that has been before it.

Acts of the character of the act of 1856 have uniformly been held to be a condition upon which every charter of a corporation subsequently granted was held, and upon which every amendment or modification was made, and that they were as much a part of the charters as if incorporated into them. Any other interpretation would render the statute inoperative, and wholly deprive it of its power to accomplish the purpose of its enactment.

In 1841 South Carolina passed a statute substantially the same as the statute of 1856. The Northwestern Railroad Company was incorporated in 1851. In 1855 an act was passed to amend its charter, the amendments exempting the railroad company from taxation. In 1868, the State adopted a new constitution in which it was declared that the property of the corporations then existing, or thereafter created, should be taxed. The legis-

lature of the State passed an act to enforce that provision of
the constitution.

The question involved in Tomlinson v. Jessup, 15 Wall.,
454, was as to the enforcement of such legislation. Justice
Field, in delivering the opinion of the court in the case, said:
"It is true that the charter of the company, when accepted
by the corporators, constituted a contract between them and
the State, and that the amendment, when accepted, formed
a part of the contract from that date, and was of the same
obligatory character. And it may be equally true, as stated
by counsel, that the exemption from taxation added greatly
to the value of the stock of the company, and induced the
plaintiff to purchase the shares held by him. But these
considerations can not be allowed any weight in determin-
ing the validity of the subsequent taxation. The power re-
served to the State by the law of 1841 authorized any
change in the contract as it originally existed, or as subse-
quently modified, or its entire revocation. The original cor-
porators or subsequent stockholders took their interests
with knowledge of the existence of this power, and of the
probability of its exercise at any time, in the discretion of
the legislature. The object of the reservation, and of sim-
ilar reservations in other charters, is to prevent a grant of
corporate rights and privileges in a form which will pre-
clude legislative interference with their exercise, if the pub-
lic interest should, at any time, require such interference. It
is a provision intended to preserve to the State control over
its contracts with corporators, which, without that provi-
sion,would be irrepealable,and protected from any measures
affecting its obligation. There is no subject over which it
is of greater moment for the State to preserve its power
than that of taxation. Immunity from taxation, constitut-
ing in these cases a part of the contract with the govern-

ment, is, by the reservation of power such as is contained in the law of 1841, subject to be revoked equally with any other provision of the charter whenever the legislature may deem it expedient for the public interests that the revocation shall be made. The reservation affects the entire relation between the State and the corporation, and places under legislative control all rights, privileges and immunities derived by its charter directly from the State."

The same doctrine is enunciated in Railroad Co. v. Maine, 96 U. S., 499; Railroad Co. v. Georgia, 98 U. S., 359; Hoge v. Railroad Co., 99 U. S., 348; Greenwood v. Freight Co., 105 U. S., 13, 21; Spring Valley Water Works Co. v. Schottler, 110 U. S., 347-352; Close v. Greenwood Cemetery Co., 107 U. S., 466-476; Louisville Gas Co. v. Citizens Gas Co., 115 U. S., 683-696; Gibbs v. Consolidated Gas Co., 130 U. S., 369-408; Sioux City Street Railway v. Sioux City, 138 U. S., 98-108.

It must be conceded from the authorities cited, the Supreme Court of the United States has repeatedly held that the legislatures of the States have the power when reserved in the charter or by general law to change or repeal acts granting corporate privileges or franchises. The decisions of this court are in accord with these opinions.

The case of Griffin v. Kentucky Insurance Company, 3 Bush, 592, has been quoted, with approval, in the case of Louisville Water Co. v. Clark, 143 U. S., 14, and in that case the court held that in all cases of charters or grants of corporate franchises when the intention of the legislature was not "plainly expressed," not to exercise the power reserved by the statute of 1856 to amend or repeal at the will of the legislature, such charters or grants must be read as if all the provisions of the act of 1856 were incorporated in them.

Judge Robertson, in delivering the opinion in Griffin v. Kentucky Insurance Co., 3 Bush 595, said: "Then was this general reservation of power, like a special reservation in the charter itself, a part of the contract; or was the contract made subject to it, and the obligation defined or modified by it? We think so. And whatever might be thought of the policy of such legislation, or of the policy or justice of the repealing statute, over which the judiciary has no jurisdiction, our conclusion, as to the mere power of repeal, is, as we think, sustained by reason and abundant authority.

"All contracts, except such as are municipal, are made subject to law, and their obligation is defined by the *lex loci contractus*. Why should the contract in this case be excepted? Such exception would be unreasonable; and the authorities fortify the reason."

In the case of Cumberland & Ohio Railroad Co. v. Barren County Court, 10 Bush, 604, in reference to the act of 1856, the court said: "The act was intended to preserve to the State control over all acts of incorporation thereafter passed. Experience had demonstrated the propriety of, if not the absolute necessity for, such a reservation of power, and it would be a manifest disregard of the clearly expressed will of the legislature for the courts to resort to technical rules of construction, or finely drawn legal implications, to escape the effect of the plain declaration that all charters of and grants to corporations shall be subject to amendment and repeal 'unless a contrary intent be plainly expressed.'"

I conclude that the legislature, in 1886, when it passed the revenue bill, had the right to amend or repeal at will all charters and grants of or to corporations or amendments thereof, enacted or granted since the 14th of February, 1856, "unless a contrary intent was plainly expressed."

In view of decisions of the courts I also concede that as to the charters of banks granted prior to the 14th of February, 1856, unless the acts extending them reserved the right to amend and repeal their charters, any act of the legislature increasing their tax would be invalid as to such banks unless in the acts extending them the right to amend or repeal was reserved.

The national banks were subject to have the same tax imposed on their shares of stock as are imposed on State banks, doing business under charters granted since the 14th of February, 1856. Their real estate is subject to taxation. Their shares of stock may be taxed at their *actual* value, but no greater rate of taxation shall be collected on them than is assessed upon the moneyed capital in the hands of individual citizens of the State.

In the case of the Covington City National Bank v. City of Covington, &c., 21 Fed. Rep., 491, Justice Matthews, discussing this subject, said: "When, therefore, a State statute taxes the shares of a stockholder at their actual or market or full value, that, necessarily, includes such value beyond its par or nominal value as is imparted to the stock by the fact that the bank has a surplus fund or undivided profits. The interest which congress has left subject to taxation by the States under the limitations prescribed, and which is a distinct, independent interest in property held by the shareholder, like any other property that may belong to him, is that interest as defined in Van Allen v. The Assessors, 3 Wall., 573, which 'entitles him to participate in the net profits earned by the bank in the employment of its capital, during the existence of its charter, in proportion to the number of its shares, and upon its dissolution or termination to his proportion of the property that may remain of the corporation after the payment of its debts;' and

(p. 587) it includes for taxation the whole interest of the shareholder, such as would pass to the purchaser of the shares on a transfer of his certificate. So, when a State law taxes shares of national bank stock, it takes the same interest of the shareholder that he would transfer on a sale. The State may tax them at their actual or at their market value, or at any other rate of appraisement which does not violate the act of congress."

To the same effect are the cases of People v. Commissioners of Taxes, 94 U. S., 415; Mercantile Bank v. New York, 121 U. S., 138.

In the latter case the court said (p. 155): "The main purpose, therefore, of congress in fixing limits to State taxation on investments in the shares of national banks, was to render it impossible for the State, in levying such a tax, to create and foster an unequal and unfriendly competition by favoring institutions or individuals carrying on a similar business and operations and investments of a like character. The language of the act of congress is to be read in the light of this policy."

The legislature of Pennsylvania passed a statute taxing the shares in national banks on an assessed value thereof for *county, school, municipal, and local purposes.*

The Supreme Court, in Hepburn v. School Directors, 23 Wall., 480, held the statute valid. It has been decided that it is competent for the State to tax the shares of national bank stock, notwithstanding the capital of the bank was invested in bonds of the United States, which were not subject to taxation.

It is no discrimination aginst them, because they are required to pay a greater tax on their shares of stock than is paid by banks enjoying special privileges under their charters. (Lionberger v. Rouse, 9 Wall., 468).

The court should endeavor to ascertain the legislative intent in the act of 1886, with reference to the taxation of banks, as all depends in this controversy upon what was that intent.

To aid in reaching a conclusion as to what the intent was, it is well to recall some official facts within the knowledge of the members of the legislature.

The first of July, 1885, was the date of the last report of the capital stocks of the banks in the State, before the enactment of the revenue law of 1886.

From that it is learned that the capital stock of the fifty-nine national banks amounted to ....................................·..............\$9,708,900 00

The capital stock of the sixty-five State banks doing business under charters granted subsequent to 1856 amounted to.............\$6,224,891 00

The capital stock of the four State banks: Farmers' Bank of Kentucky, Bank of Kentucky, Northern Bank and the Bank of Louisville, incorporated prior to 1856, was.....:......\$5,144,500 00

It will be seen from this statement that the capital stock of the national banks, and the State banks chartered since 1856, amounted, in round numbers, to \$16,000,000.00, while the capital stock of banks whose charters ante-date 1856, amounted to about 5,000,000.00, being less than one-third of that of the other banks named.

It must be presumed that the legislature knew that the banks claiming irrevocable contracts to pay only fifty cents on each share of their capital stock equal to one hundred dollars, paid less than one-third of the revenue coming from the banks under the then existing law. It can hardly be said that the Farmers' Bank of Kentucky was in a condition to claim an irrevocable contract, because the act ex-

tending its charter, which became a law on March 10. 1876, expressly reserved the right to amend or repeal its charter and amendments thereto. It reads as follows: "That the charter of the Farmers' Bank of Kentucky, as amended, be extended for a period of twenty-five years from the termination of its charter as therein fixed:

"*Provided*, That said charter and amendments shall be subject to amendment or repeal by the General Assembly, either by general or special act. *And provided further*, That while the privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested."

To simply quote the act extending the charter is a sufficient denial of and answer to the claim of an irrevocable contract. This left but three banks in the State which could claim an irrevocable contract, and one hundred and twenty-five without any claim whatever to immunity against increased taxation.

The revenue act repealed several acts by particularly naming them and excluded certain other acts from the repealing clause, and declared all other acts, general and special, and parts of acts inconsistent or not in conformity therewith, were thereby repealed. The revenue act is now chapter 92, General Statutes.

The only part of the act relating to the taxation of banks and other institutions of loan or discount is article 2, chapter 92, General Statutes. Section 1 of the article relates to the amount of tax which the banks shall pay and designates the method of levying the tax. Section 2 imposes certain duties on the cashier of the bank with reference to making a report to the auditor of public accounts. Sec. 3 exempts banks having certain money invested in bonds or funds of

the United States from taxation named in the section. Sections 4, 5, and 6 of article 2, are as follows:

§ 4. "That each of said banks, institutions and corporations, by its proper corporate authority, with the consent of a majority in interest of a quorum of its stockholders, at a regular or called meeting thereof, may give its consent to the levying of said tax, and agree to pay the same as herein provided, and waive and release all right under the acts of congress or under the charters of the State banks, to a different mode or smaller rate of taxation, which consent or agreement, to and with the State of Kentucky, shall be evidenced by writing under the seal of such bank and delivered to the Governor of this Commonwealth; and upon such agreement and consent being delivered, and in consideration thereof, such bank and its shares of stock shall be exempt from all other taxation whatever, so long as said tax shall be paid during the corporate existence of such bank."

"§ 5. The said banks may take the proceeding authorized by sec. 4 of this act, at any time until the meeting of the next General Assembly: *Provided*, They pay the tax provided in sec. 1, from the passage of this act.

§ 6. *This act shall be subject to the provisions of section eight (8), chapter sixty-eight (68), of the General Statutes.*"

Section 7 provides that if the banks fail or refuse to make the consent and agreement as provided in section 4, then they are to be assessed and the same tax, State, county and municipal, shall be imposed, levied and collected, etc., as is imposed on the assessed taxable property in the hands of individuals.

Without section 4, the remaining sections of the article would have been a complete system for levying and collecting taxes on the banks chartered after 1856. *The article treats of nothing except the taxation of banks.*

It seems there can be no question of the power of the legislature, at that time, to impose a tax on such banks for State, county and municipal purposes.  It was wholly useless for the legislature to ask the assent of the banks chartered since 1856 to make any consent to the imposition of tax on them for that purpose.  The national banks are subject to the payment of taxes for State, county and municipal purposes, and it was not necessary to obtain their consent that they might be taxed for that purpose.

It was needless to ask this class of banks to enter into the agreement.  The legislature may have entertained some doubt, not as to the right to tax national banks for State, county, and municipal purposes, but as to the method prescribed, and desired to remove all doubt by obtaining the consent of such banks to that method.

It was greatly to the interest of the national banks and the State banks, chartered subsequent to 1856, to enter into the agreement, because they were thus released from the payment of county and municipal taxes.  In agreeing to pay the amount provided in the article for State purposes, they were released from local burdens, which in some instances are two or three times as great as that which they agreed to pay the State.  It was greatly to their interest to accept the proposition of the State.

As a matter of fact, these banks were relinquishing no rights.  They were, apparently, yielding a right which the State, in its sovereignty, already possessed.  The right had never been relinquished, but had been expressly reserved.  So vigilant had been the State to retain the control of corporations and retain its power to tax them, its purpose to do so was declared in the form of a legislative enactment, which was understood to be written in every act of incorporation.

It may be a more difficult task to show why the three old banks entered into the agreement. Their right to the immunity from increased taxation was questioned, as shown by the revenue act, as their charters were declared repealed, so far as they were inconsistent therewith.

It was the evident purpose of the legislature to induce these banks to recede from their claim to an irrevocable contract. It was desired that all banks should be placed upon the same footing in the matter of taxation with the other banks of the State. The legislature had been renewing their charters, and if they were again renewed, an appeal must be made to the same power. These banks may have realized that the act of 1856 should have, by a proper interpretation, been made applicable to the acts renewing their charters. However, it is needless to speculate further as to the reasons which induced them to enter into the contract with the State by which they released any irrevocable contract which they had under their charters, against increased taxation.

These banks had the right to give their consent to the increased taxation. The courts have always recognized the right of a corporation to consent to legislation or accept its provisions and be bound thereby, though it may have the effect of depriving such corporation of a vested right.

This brings me to the question as to what were the terms and conditions of the contract into which all these banks entered. The banks must be presumed to know the law and the effect of the contract to which they agreed. Those who represent banks are among the brightest and most sagacious business men of the country.

The contract is brief, simple and without ambiguity. In short, the State agreed to accept and the banks agreed to pay seventy-five cents annually, on each share of their stock

equal to one hundred dollars, and in consideration thereof be exempt from all other taxation whatsoever, so long as the tax shall be paid during the corporate existence of such banks.

If these were all the terms of the contract then it might be contended with some reason that it was irrevocable during their corporate existence. Being mindful of the policy which had been pursued for thirty years, it said in effect to the banks, it is desired that the contract be signed in the formal way prescribed, but it must be understood that the right to alter, change or abandon the contract is reserved to the State.   That its purpose might be fully understood, the legislature placed in the article section 6, which, in terms, makes the statute of 1856 a part of the contract.  It is expressly provided that the article shall be subject to the provisions of sec. 8, chap. 68, Gen. Stats.

The legislature was determined that the provisions of the act of 1856 should not depend on rules of construction to be read into the contracts by modification, but in terms said that it should be part thereof.   It is admitted that when the word "act" appears in article 2, it has reference to the article (2).

Article 2 was an independent measure, offered as a substitute to article 2 of the original bill.   The substitute was adopted, and became a part of the revenue bill.   It now appears as part of the bill in the exact language as offered.

This section 6 has no reference to any part of the revenue bill, *except the article of which it is a part.*

It has been suggested that it had reference to new banks that might be organized.  This could not be so because article 2 is dealing with banks in existence, and asks them to give their consent, etc. thereto, and says if at *all, they*

must do so before meeting of the next General Assembly. When it is admitted that the word "act," as used, is synonymous with "article," then it must be admitted that the provisions of section 6, of article 2, are applicable alone to the article (2) of which it is a part.

If there could be any doubt, from the language used, as to the meaning of the legislature, then that must be removed by an examination of the House and Senate Journals. An amendment (p. 1241, House Journal, 1886) was offered to article 2, of the original revenue bill, and section 7 of that amendment read as follows: "This act shall not be subject to the provisions of sec. 8, chap. 68, of the General Statutes."

The amendment (p. 1243, House Journal, 1886) was defeated.

While the revenue bill was pending in the Senate, it was proposed to amend section 6, of article 2, by inserting after the word "shall," in the first line, the words "not for ten years." (P. 1315, Senate Journal, 1886.) This amendment was defeated. Had it been adopted, then the section would have read: "This act shall not for ten years be subject to the provisions of section eight (8), chapter sixty-eight (68), of the General Statutes."

The proceedings of the House and Senate show the legislature fully understood the purpose for which this section was made part of article 2. It was the purpose of the legislature not to be restricted for any period of time in its right to repeal the article and withdraw from the contract.

In view of the plain provisions of the statute about the meaning of which there should be no doubt, and the intent of the legislature being fully explained by its records, it seems to me there should be no hesitation in concluding

the act of 1856 should be read as part of the contracts; hence, they are not irrevocable.

The fact that a written consent was asked and secured does not alter the application of the act of 1856. To this effect is New Jersey v. Yard, 95 U. S., 104. The facts of that case were as follows:

The Morris & Essex Railroad Company was created a corporation by an act of the legislature of New Jersey, passed January 29, 1835. The act provided that as soon as the net proceeds of the railroad amounted to 7 per cent. on its cost, it should pay a State tax of one-half of 1 per cent. on the cost of the road, and no other tax should be levied upon it.

The twentieth section reserved to the legislature the right to amend or repeal the act whenever it should think proper. A supplemental act was passed on March 2, 1836, in which the right to repeal or amend was reserved.

On the 14th of February, 1846, the legislature of New Jersey passed an act in effect the same as the Kentucky act of 1856. Another supplemental act to the charter of the railroad was approved March 23, 1865, authorizing a branch road to be built, and by which the company was vested with all the powers and franchises given by original and supplemental acts, etc.

The third section of the last named act reads as follows:

"Be it enacted, that the tax of one-half of one per cent. provided by this said original act of incorporation, to be paid by the said company to the State, whenever the net earnings of the said company amount to seven per cent. upon the cost of the road, shall be paid at the expiration of one year from the time when the road of the said company shall be open and in use to Phillipsburg, and annually thereafter, which tax shall be in lieu and satisfaction of all.

other taxation or imposition whatever, by or under the authority of this State, or any law thereof: *Provided*, That this section shall not go into effect or be binding upon the said company, until the said company, by an instrument, duly executed under its corporate seal, and filed in the office of the Secretary of State, shall have signified its assent thereto, and which assent shall be signed within sixty days after the passage of the act, or this act is void."

The instrument required by this act was duly executed by the company.

*In the act of 1865 there was no reservation of the right to repeal or amend it.*

Acts of the legislature imposed a more burdensome tax on the railroad company than that provided for in sec. 3, *supra*.

The sole question in New Jersey v. Yard was whether the act of 1865 and its acceptance by the railroad company constituted a contract, which could not be impaired by any subsequent legislature of the State. The court held that it was an irrevocable contract, *because the legislature had not reserved the right to amend or change it.*

It is plain from the opinion that had the legislature reserved the right to alter or change the contract or act by which it was made, the court would have held the act of the legislature doing so did not impair the obligation of the contract. Justice Miller, in delivering the opinion said:

"But as we have already said, since the legislature, which passed the act of 1865 had the power to make a contract which *should not be subject to repeal or modification* by one of the parties to it, without the consent of the other, the main question here is: *Did they intend to make such a contract?*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"In the case now under consideration, it is conceded on

all hands that the act of 1865 was a contract for a tax of one-half of one per cent. per annum on the cost of the Morris & Essex Railroad and no more. But counsel for defendant says the contract was repealable; that the legislature of its own volition could impose other and more burdensome taxes at its discretion; that it was a contract so long as the legislature of New Jersey was satisfied with it and no longer. It is conceded, also, that this construction of it can not be sustained, unless we are bound to import into it either the reservation clause of the act of 1836, or what is called the interpretation act of 1846. We have already shown how little reason there is for doing this on general principles of construction. We think it still clearer that it can not be done, because it is inconsistent with the legislative intent in passing the act of 1865.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"The implication is of a right to revoke it, and comes from the other quarter, and is one which *we do not think exists by fair construction, and* which we do not feel at liberty *to import into the contract* to defeat its manifest purpose."

From the language of this opinion and the long line of decisions of the same court, it is manifest that the decision was made to turn on the question of the reservation of the right to amend or repeal, etc.

In order to hold that the right to alter, etc., the contract made under article 2, does not exist, it is absolutely necessary to eliminate section 6 from the article. No such a rule for the interpretation of statutes can be found, as the meaning of the section is manifest and clear.

Besides, by the very terms of the act of 1856, a rule of interpretation is given that "all charters and grants of or to corporations or amendments thereof *and all other statutes,*" shall be subject to amendment or repeal at the will

of the legislature, unless a contrary intent be therein "plainly expressed."

It is proposed now by those representing the banks to dis-regard this statutory rule of construction. It is now in effect insisted that in order to reserve the right claimed, it must be "plainly expressed" in the act that it is reserved. This being done, it is still disregarded. The legislature, doubtless anticipating such contention and versatility, "plainly expressed" in the article that whatever was done thereunder or in pursuance thereof could only continue during its will. If section 6 was not for this purpose, I should like to have the court to suggest some reason as to why it was placed in the article. The doctrine is that where it is asserted that a state has bargained away her right of taxation in a given case, the contract must be clear and can not be made out by dubious implication. (New Jersey v. Yard, *supra*.)

The taxing power of the State is never presumed to be relinquished unless the intention to relinquish is expressed in clear and unambiguous terms. (Bradley v. McAtee, 7 Bush, 667.)

It is a familiar rule of construction of statutes that effect must be given to every provision except in cases of absolute and irreconcilable incongruity. (Dazey v. Killam, 1 Duv., 407.)

If one statute refers to another for the power given by the former, the statute referred to is to be considered in-corporated in the one making the reference. (Nunes v. Wellisch, 12 Bush, 365.)

Mr. Cooley, in his work on Taxation (p. 204), says: "As taxation is the rule and exemption the exception, the in-tention to make an exception ought to be expressed in clear and unambiguous terms, and it can not be taken to have been

intended when the language of the statute, on which it depends, is doubtful or uncertain."

For the interpretation of statutes this court in Nichols v. Wells, Sneed, 259, said that "the most natural and genuine way of construing a statute is to construe one part by another part of the same statute; that the words and meaning of one part of a statute do frequently lead to the sense of another, and if it can be prevented, no *clause* or *sentence* or *word* shall be superfluous, void or insignificant."

As there is a clear expression of the legislative intent in the statute, no rules are really necessary to aid in its interpretation.

If A should rent B his farm for a term of ninety-nine years in consideration of a certain annual rental, but it was written in the contract that it was "subject" to be annulled at the will of A, in the interpretation of this contract would not a court hold that the entire instrument was to be considered in determining its effect? Would not A's right to annul the contract be just as enforceable as B's right was to enter upon the farm under the contract?

Whilst it might be said it was an unwise contract on the part of B, yet being capable of contracting he would be bound thereby, and a court would certainly not hold, because it appeared to be an unwise contract for B to have entered into, that therefore A did not reserve the right to annul the contract. This is the character of interpretation which must be employed to sustain the contention of counsel for the old banks.

It can hardly be said. it was an unwise contract on the part of one hundred and twenty-five of the one hundred and twenty-eight in the State, as by the very terms of the act, under which the contract was entered into, they were re-

quired to pay State, county and municipal taxes, with the power in the legislature to increase it at will.

It certainly was a very advantageous contract for them to enter into. When these banks paid more than two-thirds of the taxes paid by all banks with the power in the legislature to increase the amount if they should so desire, what reason can be suggested as to why the legislature would desire to reverse the policy which had been steadfastly adhered to for so long, and enter into an irrevocable contract with such banks? Why should it want to surrender a power which it had been so zealous to preserve?

The contract was made subject to the right of the legislature to withdraw from it whenever it regarded the public interests demanded it should do so.

Whenever the banks accepted the provisions of the act of 1886, they surrendered any rights to immunity from increased taxation which their charter gave them.

The acceptance of the act of 1886 was a consent to the repeal of so much of their charters as were inconsistent therewith, hence they stood in such relation to the State as to future taxation as the legislature saw proper to impose.

If the provisions of their charters relating to taxation were repealed, as it must be admitted they were by the act of 1886, then such provisions were no longer in force. It is unreasonable to say that the provisions of the charters fixing the rate of taxation in the banks at fifty cents on each. share of the capital stock of the banks equal to one hundred dollars can be in force, if the act of 1886, fixing such tax at seventy-five cents instead of fifty on shares, is in force. The court admits the latter is in force. In doing this it must be admitted the charter privilege has been repealed.

If repealed then by the act of 1886, surely the only way

in which the provisions of this charter could be restored would be by the legislature so providing in said act. There is no pretense this has been done. The fact that the law of 1886 has been repealed does not restore the former provisions of their charters.

Sec. 464, Kentucky Statutes, provides: "When a law which may have repealed another shall be repealed, the previous law shall not be *revived*, unless the law repealing it be passed during the same session of the General Assembly."

It is a most groundless contention to say that if the present law is sustained the old banks will be restored to the former privileges under their charters.

It has been suggested that the provisions of their charters with reference to taxation were vested rights, and, although they consented to the legislation of 1886, and became subject to the provisions of the act of 1856, still, as the charter privilege as to taxation was a vested right, therefore it was saved to them by the proviso which preserves "other rights previously vested." The purpose of the act of 1856 was to reserve in the legislature the power to destroy the privileges and franchises granted in the charters.

If it does not have this effect, it would be entirely inoperative, and the effort to retain control of corporations would be abortive. The claim that the privileges granted by art. 2 can be repealed, but without the right to terminate the contract with the banks, is not founded in reason.

The only privilege which the banks enjoyed was to pay the seventy-five cents on each share of stock in lieu of all other taxes.

To say that the law granting the privilege can be repealed because the right to do so was reserved, as is admitted by

this court, and still leave the banks in its enjoyment (*as is the effect of the opinion of this court*), is to employ logic that has never been in common use by this or any other court. This logic gives the banks the substance and the State the: shadow.

The preserved rights then are not privileges and franchises granted by the repealed charter, but "other rights" which had vested previous to the act amending or repealing the charter.

The other rights are such as the beneficiaries under the charter may have acquired, in property, choses in action, real and personal property, or interests of every character which they could acquire in operating under the charter, and also such rights or interests as other persons may have previously acquired by contract, mortgage, judgment or otherwise, in the property belonging to the corporation.

My contention has been recognized as correct in all the decisions of this court, in passing upon the act of 1856. The Supreme Court of the United States has so construed the act. It was said in Griffin v. Kentucky Insurance Co., 3 Bush, 594: "The proviso was intended to secure the rights of beneficiaries and others vested under the charter before its amendment or repeal, and does not affect the mere power to repeal the franchise." To the same effect is Cumberland & Ohio Railroad Co. v. Barren County Court, 10 Bush, 609.

Section 174 of the constitution recognized a just principle when it declared that all property, whether owned by persons or corporations, should be taxed in proportion to its value, unless exempted thereby, and that all corporate property should pay the same rate of taxation paid by individual property.

The legislature, in obedience to that provision of the con-

stitution, enacted the law for levying and collecting the tax from the banks of the State the validity of which is in question in these cases. For the reason already given, I conclude that the obligation of no contract was impaired by the action of the constitutional convention or the succeeding legislature. Some of the best lawyers in the State were members of the convention which framed our constitution, who gave an earnest consideration to the question involved in these cases, and their conclusions which they reached were crystallized inso section 174 of the constitution. I believe that their conclusions are correct.

The opinion of the court denies the power is in the legislature to say what taxes the banks of the State shall pay for State purposes during the existence of their several charters. It denies the right of the legislature to compel them to bear any of the burdens of county and municipal governments. I can not believe the legislature did, or intended, by art. 2, of the act of 1886, to reverse its policy so earnestly pursued for a generation, and surrender to sixty odd banks of the State its right previously reserved to control them in the matter of taxation and to give up its power to increase or diminish the taxes imposed on one hundred and twenty-five banks, this including the national banks.

Exigencies may arise requiring the levying and collecting of vast sums to meet the public demand, yet, however great the emergency may be or imperative the demand for money to meet such wants, the legislature is powerless to compel the banks to contribute more than they are now paying at any time during their corporate existence.

The counties and municipalities are annually compelled to raise large sums of money by taxation. The counties of the State are compelled to incur large expenses to sup-

port the county governments, to pay for bridges and public highways and to support their unfortunate citizens. The municipalities must incur great expense in making all necessary improvements for the comfort, safety and health of their citizens, to supply water and lights and to give police protection to their citizens and to the banks, yet the court concludes that the legislature has no power to compel the banks to contribute their fair share of such expenses.

In this view I can not concur.

Judges Lewis and Guffy concur in this dissenting opinion.