JUDGE. LINDSAY
delivered the opinion oe the court.
This is an agreed case in which, two questions were submitted to the circuit court for adjudication.
First—Is the act of the General Assembly, approved March 11, 1873, entitled “An act to amend an act to incorporate the Cumberland & Ohio R. R. Co.,” constitutional and valid?
Second—If it is constitutional, is it the duty of the county judge of Barren County to issue and deliver at once so many of the bonds of the county as are necessary ip enable the Cumberland & Ohio Railroad Company to comply with its contract to loan to the Glasgow Railroad Company $116,666.66 of said bonds, or has the county judge the right to withhold all the bonds for the present, and deliver them only in the manner and to the extent provided by the said act of March 11, 1873?
The facts as agreed by the parties are substantially as follows:
First—The Cumberland & Ohio Railroad Company, in the exercise of a right conferred upon it by the fifteenth section of its charter, applied to the County Court of Barren County on the 5th day of April, 1872, to submit to the qualified voters of said county a proposition for the subscription by the county for $350,000 of the capital stock of the railroad company.
Second—The county court made the order as requested, and the proposition was voted on May 4, 1872, and a majority of the qualified voters voting at the election pronounced in favor of it.
Third—In January, 1873, the county court made an order directing the judge thereof, upon a given contingency, to sub *607 scribe, for and on behalf of the comity, for the amount of the capital stock hereinbefore stated.
Fourth—That the railroad company on the 10th of July, 1873, rejected or attempted to reject the amendment to its charter passed and approved the 11th of March, 1873, and so notified the Barren County Court.
Fifth—That the presiding judge of said county court at different meetings of the stockholders of said company cast the votes to which Barren County was entitled by reason of such subscription of stock, for and on behalf of such county, in the election of directors, and upon other questions about which said stockholders were called upon and authorized to vote.
A further important fact appearing from exhibit C is that one of the conditions upon which the county judge was directed to subscribe for the stock was that $116,666.66-f of the bonds of the county were “to be delivered to the president and directors and company of the Glasgow Railroad Com'pany, as per contract entered into between the president and directors of the Cumberland & Ohio Railroad Company and the president and directors of the Glasgow Railroad Company,#dated the 30th of April, 1872.” The substance of said contract is that in consideration of the bonds of the county to be delivered to the Glasgow Railroad Company it is to mortgage its road, fixtures, franchises, etc., to the Cumberland & Ohio Railroad Company, the mortgage to be foreclosed by the last-named company at such time as its road may be finished to Glasgow.
Upon these facts the parties to the agreed cause asked the circuit court to render such judgment as the railroad company had the legal right to demand. Said court adjudged that the act of March 11, 1873, was constitutional, and that the railroad company was entitled to no relief whatever; and from that judgment it has appealed to this court.
*608 It claims that under the fifteenth section of its charter it had the vested right to solicit and receive from any county through which its road should pass subscriptions for stock in such amounts as said county might desire, and to receive in satisfaction of subscriptions so made the bonds of the county subscribing, and that this right could neither be divested, modified, nor in any way impaired by subsequent legislation.
In answer to the argument that the right to repeal, alter, or amend its charter was reserved by the act of February 14, 1856, it insists that the legislature by the provisions of its said charter “plainly expressed” its intention not to reserve any such right.
The second section of the act of incorporation provides that the company shall have “perpetual succession;” the fifteenth section that there shall be levied, for the purpose of paying the interest and finally the principal of bonds executed and delivered by any city, town, or county in'payment of its subscriptions for stock, an annual tax, and that the tax-payers shall receive stock in the company to the amount of their tax-receipts. The sixteenth section confers upon the company all the powers and privileges possessed by the Louisville & Nashville Railroad Company. The eighteenth section of the charter of that company vests in the corporation the title to its road, franchises, and all its property of every character and description, and provides that it and its successors shall hold such title forever, and shall be protected against the competition of rival roads running parallel to its main line.
The amendment of February 6, 1858, authorized said last-named company to pledge its income for the payment of certain of its bonds; and that of February 21, 1868, authorized it to issue bonds running thirty years, and prescribed the duty of the company and its officers touching the mortgage that might be executed to secure the payment of such bonds when issued and sold.
*609 It is difficult to deduce from any or all of these grants the conclusion that the legislature intended to relinquish the power to alter, amend, or repeal appellant’s act of incorporation. There is certainly nothing in the language used, nor in the character of the privileges and franchises granted and conferred, authorizing us to say that the intent to relinquish that power is “plainly expressed.” It was to protect the state against irrevocable grants of powers, rights, franchises, etc., to private corporations that the provision was made in the act of 1856 “that all charters and grants of or to corporations, or amendments thereof, and other statutes shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed.
The act was intended to preserve to the state control over all acts of incorporation thereafter passed. Experience had demonstrated the propriety of, if not the absolute necessity for, such a reservation of power, and it would be a manifest disregard of the clearly-expressed will of the legislature for the courts to resort to technical rules of construction or finely-drawn legal implications to escape the effect of the plain declaration that all charters of and grants to corporations shall be subject to amendment and repeal “unless a contrary intent be plainly expressed.”
We do not doubt the power of the legislature to amend at will appellant’s charter, provided the amendment or modificátion does not affect its title to or right of enjoyment in some property right that has previously vested.
The power to pass the amendment under consideration in this case is not such a power as was attempted to be exercised in the passage of the amendment to the charter of the Western Baptist Theological Institute. In the case of Sage v. Dillard (15 B. Mon. 340) this court decided that the legislature, under the guise of an amendment to that charter, attempted to take the “charity out of the hands of those to whose care and *610 oversight ■ the founders confided it, and place it in the hands of strangers who never breathed perhaps a single breath of vitality into the institution, either to impart to it life or growth.”
The power thus to take from the corporation the right to manage and control its own private affairs was denied, notwithstanding the fact that the power to alter or amend the act of incorporation had been reserved. The amendment to appellant’s charter does not divest the corporation of any óf its property, rights, privileges, or franchises, and does not interfere with or abridge its right to manage and control its business affairs by and through its chosen agents and representatives. It is such an amendment as the legislature had the power to make, and it can not be rejected by the corporation., (Tomlinson v. Jessup, 15 Wallace, 454; Miller v. The State, ibid. 478.)
The provisions of the amendment of March 11, 1873, of which appellant specially complains, are those embodied in sections 9 and 11. Section 9 prohibits the county judges of the counties of Allen and Barren from issuing the bonds of their respective counties in payment of any stock for which said counties, or either of them, may have subscribed until the road is put under contract in and through his county, and then, only upon the monthly report of the local engineer of the estimates of the value of the work actually done in such county, which reports shall be verified, and filed and preserved in the office of the county court. Section 11 makes it the duty of the respective county judges to issue, upon demand, the bonds of their counties to an amount equal to the “ value of the work actually done in such county, and no more, until the estimates made are reported and filed, . . . and the work is actually done in said county equal in amount and value to the whole amount of stock so subscribed for by such county; . . . and then it shall be the duty of the judge *611 of said county court to deliver to the president of said company the bonds of said county to an amount sufficient, with what may have been previously delivered at par value, to pay all the stock subscribed for by said county to said railroad company.”
By the provisions of the original charter the company was entitled to demand and receive at once bonds to an amount equal to the amount of stock subscribed for, and hence the act of March 11, 1873, materially modifies its rights in this regard. Hence it is that we are asked to declare sections 9 and 11 of said act inoperative and void, upon the ground that the provisions of such sections can not be enforced Avithout impairing the obligations of the contract of Barren County for the subscription for the three hundred and fifty thousand dollars of the capital stock of the railroad company.
Whatever limit section 10 of article 1 of the Federal constitution may impose upon the power of the states to legislate with regard to such subscriptions (a question we need not inquire into in this case), it is very clear that unless before the passage of the act of March 11, 1873, the contract of subscription had been fully consummated, the act does not fall Avithin the constitutional inhibition. Unless the county Avas absolutely bound to take the stock and deliver its bonds in satisfaction of the subscription, the contract or negotiation remained executory in its nature, and was still subject to the control of the legislature. In passing upon a similar question the Supreme Court of the United States used this language: “Without stopping to inquire whether or not the power conferred upon the board of commissioners in the charter and amendments of the railroad company, in the form and with the conditions therein mentioned, constitutes a contract, the court is of opinion that in view of the body upon Avhich the power is conferred, and of the nature of the power itself, no such contract existed, if any, as is contemplated by this clause *612 of the Federal constitution. The power or authority contained in the -charter, and out of which the right in question is claimed to arise, is conferred upon the county, a public corporation or civil institution of government, and upon public officers employed in administering its laws, and the power or authority itself concerns this body in its political capacity.” (Aspinwall v. The County of Daviess, 22 Howard, 364.)
In the Dartmouth College case (4 "Wheaton, 627) Chief Justice Marshall said that the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions adopted for internal government, and that the instrument they have given us is not to be so construed; and in Aspinwall’s case the court further said that “it would be difficult to mention a subject of legislation of more public concern, or in a greater degree affecting the good government of the country, than that involved in the present inquiry. The power conferred upon the board of commissioners by the provisions of the charter, among other things, embraced the power of taxation, this being the ultimate resort of paying both the principal and interest of the debt to be incurred in the subscription and issuing of the bonds;” and it was held that inasmuch as the contract of subscription had not actually been made, although the subscription had been voted for, it remained unexecuted and obligatory upon neither party, and therefore clearly subject to be annulled or modified by the state.
It is not the duty of the courts to review or revise the action of the legislature, but to enforce its will, and it is only when it has failed to keep within the constitutional limits to its powers that they are at liberty to refuse obedience. They will not pass upon a constitutional question and decide a statute to be invalid unless a decision upon that very point is necessary to the determination of the cause. (Cooley’s Constitutional Limitations, pp. 160, 163; Hoover v. Wood, 9 Ind. *613 287; Ireland v. The Turnpike Company, 9 Ohio State Rep. 373.) Further than this all doubts as to the constitutionality of an enactment will be resolved in favor of its validity, and it will be upheld unless clearly unconstitutional. (McReynolds v. Smallhouse, 8 Bush, 447; City of Lexington v. McQuillan’s heirs, 9 Dana, 513.) And this rule applies equally when the existence of an extrinsic fact not appearing upon the face of the act is essential to deprive the legislature of the power to pass it. The existence of such a fact must be clearly established, otherwise the courts will regard the legislature as having acted within the limits prescribed by the fundamental law.
Hence, unless we can ascertain from the agreed facts with reasonable certainty that the county of Barren had actually completed the contract of subscription by subscribing for the stock in the mode prescribed by the company’s charter anterior to the 11th day of March, 1873, the act passed and approved on that day will be held and treated as constitutional and valid.
In the statement of the points in controversy the only allusion to the subscription is the recital of the claim of the company that certain sections of the act of March, 1873, are “in violation of the rights vested in and secured to said company previous to the passage thereof, and that it is entitled to and has demanded that the bonds of Barren County be issued and delivered upon the terms and conditions and in the manner prescribed in the order of said court submitting the proposition to the people of said county, hereinafter referred to, and in pursuance of the act incorporating said company and the amendments thereto passed by the General Assembly previous to the submission of said proposition.”
In the subjoined statement of the agreed facts it is nowhere stated that a subscription for the stock had actually been made prior to March 11, 1873, nor indeed that it had *614 ever been made. After stating that the proposition to subscribe had been submitted to the people and ratified by a majority of those voting, it is further said “that the presiding judge of said county court at the different meetings of the stockholders of said company cast the vote to which Barren County was entitled by reason of such subscription of stock.”
The expression “such subscription of stock” would most naturally refer to some statement that had preceded its use. It must certainly refer to a statement of fact somewhere made in the paper setting out the questions in controversy and the facts upon which they are to be determined. The fact that a subscription for the stock had been made anterior to March 11, 1873, or that it has been made at all, does not appear in said paper, nor in the record before us.
The deduction that we draw from the language used by the parties is that they have treated the ratification by the voters of Barren County of the proposition to subscribe as equivalent to an actual subscription, and for that reason the company had permitted the county judge to cast in the name of Barren County votes representing the amount of stock embraced in the proposition submitted to the voters of the county. This conclusion is supported by the order of the county court made at the January term, 1873. This order directs the county judge, so soon as the company’s road shall have been located through the county, as provided by the charter and the order of said courts made April 5, 1872, and in accordance with appellant’s contract with the Glasgow Railroad Company, to subscribe for and on behalf of Barren County for $350,000 of the stock.
This order does not in itself amount to a subscription, and it is evident that it was not so intended. The county judge was not empowered to make it until the road had been located in the manner pointed out. It does not appear that the county judge has yet deemed it his duty to act in the matter, nor that *615 the subscription for this stock was made or attempted to be made prior to March 11, 1873. It does, however, appear that the road was not located through Barren County until the 10th day of'March, 1873, the day before the act under consideration was approved, and the conclusion is almost irresistible that the county judge could not have acted, if indeed he has acted at all, after the location of the road and before the approval of the act. As we can not determine that the contract had been fully completed before the passage and approval of the act, we can not adjudge that it constituted such a contract as is contemplated by the clause of the Federal constitution which inhibits the states from passing laws impairing the obligations of contracts.
From the comprehensiveness of the language used in sections 9 and 11 of the act, it would seem that no part of the subscription was to be paid by Barren County except upon the estimates made by the local engineer, and that the delivery of the bonds of the county can not be completed until work is done in the county equal in value to the whole amount of stock subscribed for; but the 12th section is utterly irreconcilable with this view. That section provides “that nothing in this act shall be so construed as to avoid a contract made by and between the president and directors of the Cumberland & Ohio Railroad Company and the president and directors of the Glasgow Railroad Company; but each of the contracting parties and the contract itself shall stand in the same attitude in relation to the subject-matter of said contract just as though this act had not been enacted.”
We may here observe that the validity of the contract between the two railroad companies is not called in question by the appellee, and hence it is not necessary that we shall notice the arguments presented to sustain the assumption that it is invalid. The contract binds the appellant as follows: “ When the county judge of Barren County makes a subscription to the *616 capital stock of the C. & O. R. R. of not less than $350,000, and issues and delivers to said C. & O. R. R. Co. the bonds of Barren County in discharge of said subscription, then said C. & O. R. R. Co. will loan to the Barren County Branch Railroad Company $116,666.66 of said Barren County bonds, upon condition that a mortgage on said Barren County Branch Railroad and its franchises, rights, and fixtures, in accordance with a proposition submitted by J. P. Nuckols, John S. Bohannon, and Wood Shobe, directors of said Barren County Branch Railroad Company, dated March 26, 1872.”
As the law stood at the time this contract was entered into, the Cumberland & Ohio Railroad Company would have had the right to demand and receive from the county of Barren the whole amount of bonds necessary to discharge its subscription so soon as it should be made; and it may fairly bo inferred that the branch road company expected to receive and the appellant to deliver the $116,666.66 in bonds immediately after the subscription by Barren County should be made. Such is the legal interpretation of the stipulations of the contract.
Now the 12th section of the act of 1873 provides that “each of the contracting parties and the contract itself shall stand in the same attitude in relation to the subject-matter of said contract just as though this act had not been enacted.” The subject-matter of the contract is the loaning of the bonds. The original attitude of the parties was such that one had the right to demand and the other was bound to deliver the $116,666.66 of bonds so soon as the county judge of Barren County should make the subscription. The only way in which these parties can be maintained in this attitude is for the county court, so soon as it subscribes for the stock to be taken by the county, if it shall become its duty to subscribe, to issue and. deliver bonds to appellant to an amount sufficient to enable it to comply with its said contract, in case said contract shall be *617 beld valid. This being done, it will then become his duty to observe and obey the provisions of sections 9 and 11 of the act of 1873. In this way only can all the provisions of that act be harmonized and enforced; and this must be done in all cases where it is practicable.
If it appeared that the county court had failed upon proper application, after the 10th day of March, 1873, to subscribe for the stock, or after subscribing therefor had failed and refused to deliver the bonds of the county, in accordance with the conditions of the subscription and the provisions of the company’s charter and the amendments thereto, including that of March 11, 1873, appellant would be entitled to a reversal; but as neither of these facts are made to appear, and as we regard the judgment of the .circuit court as leaving all questions except those herein decided open for future adjudication, it must be affirmed.