NORTHERN BANK OF KENTUCKY v. STONE et al.

(Circuit Court, D. Kentucky. June 4, 1898.)

No. 6,585.

1. RES JUDICATA—PARTIES CONCLUDED.

In a suit by a bank to enjoin a county from collecting a tax, an adjudication that the bank had an irrevocable contract with the state for exemption from such taxes by reason of accepting the provisions of a certain prior act is not conclusive, in a subsequent suit involving the right of other counties and certain municipal corporations to collect taxes from the bank under the same statute.

2. SAME — CONCLUSIVENESS AS TO PARTY NOT OF RECORD — PRESENCE OF ATTORNEY.

The fact that, in a suit to restrain a county from enforcing collection of a tax under a state law, the attorney general of the state appears in the court of appeals in behalf of the commonwealth, which is not a party to the record, does not make the adjudication res judicata as against the state, and as against other counties and municipalities thereof.

3. CORPORATIONS—REPEAL OF CHARTER—IRREVOCABLE CONTRACTS.

Act Ky. 1856, declaring that all charters and grants of or to corporations, or amendments thereof, and all other statutes, "shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed," applies not only to subsequent grants of original charters, but to extensions of pre-existing charters.

4. SAME—EXTENSION OF BANK CHARTER.

The Kentucky statute of 1884 extending the charter of the Northern Bank of Kentucky without new conditions, except that the extension shall be formally accepted by the bank, shows no intention that the extended charter shall not be subject to repeal or amendment in accordance with the provisions of the act of 1856.

5. TAXATION OF BANKS—CONTRACT EXEMPTIONS.

The Kentucky statute of 1886 known as the "Hewitt Act" lays a tax of 75 cents per share on banks and certain other corporations, and, in section 4 of article 2, declares that all banks and corporations accepting the act shall be exempt from all other taxation so long as said tax shall be paid. Section 6 provides that the act shall be subject to the act of 1856, making repealable and amendable all charters or amendments, and other statutes thereafter passed. Held, that the acceptance of the act by a bank merely created a contract exemption from other taxation which the legislature could revoke at pleasure.

Bill by the president, directors, and company of the Northern Bank of Kentucky against Samuel H. Stone and others.

The bill in this case averred that the complainant bank was a corporation originally organized by an act of the general assembly of Kentucky approved February 20, 1835, to do a general banking business. Its corporate life was made to terminate May 1, 1865. The act of February 15, 1858, continued the charter privileges of the complainant in full force for 20 years from May 1, 1865, upon its acceptance of certain conditions, to which the complainant duly consented. An act approved February 6, 1882, provided that the charter rights and privileges of the complainant should continue and extend in full force for 20 years from and after May 1, 1885; reserved to the general assembly the right to alter, change, amend, or repeal the act, and the charter and amendments thereto; and required that, before the act should go into effect, it should be approved and accepted by a majority in interest of the stockholders. The act was never accepted or approved by the stockholders. Thereafter another act was passed, approved March 6, 1884, providing that the chartered rights and privileges of the complainant should be extended in full force for 20 years from and after the 1st of May, 1885, and that the act should go into effect when it should be approved by the stockholders of

the bank and notice of the approval given to the governor of the common-
wealth. It did not contain the clause reserving to the legislature the power
of repeal. It was duly accepted. The fifteenth section of the original charter
of the complainant required the cashier to pay to the treasurer of the com-
monwealth 25 cents on each $100 of stock held and paid for in said bank
which should be in full of all tax or bonus: provided, that the legislature might
increase or diminish the same, but at no time should the tax exceed 50 cents
on each $100 of stock paid for in said bank. By an act of 1836 the legisla-
ture increased the tax to 50 cents; and this the complainant paid each year
down to July 1, 1886, when the Hewitt law was passed. The court of ap-
peals of Kentucky, as early as 1838, held that the language in the complain-
ant's charter constituted a contract with the state, which was inviolable,
and a limitation on the legislative power to tax the stock of the bank or its
property. Johnson v. Com., 7 Dana, 339. By a subsequent decision it was
determined by the same court that the limitation included taxation by any
of the municipal subdivisions of the state, and therefore prevented such mu-
nicipal subdivisions from taxing the real estate of the bank, although situ-
ated within their boundaries. Farmers' Bank of Kentucky v. Com., 6 Bush,
127. The complainant duly accepted within the required time, the benefit
of the Hewitt act, by filing a consent in writing, under the seal of the bank,
with the governor of the commonwealth, and paid the tax under the Hewitt
act from that time down to July 1, 1893. Thereafter the auditor of
state refused to receive the tax under the Hewitt law, although tendered by
the complainant. Upon the announcement of the decision of the court of
appeals in 1895 (31 S. W. 1013), payment was accepted from the bank for the
amount due under the Hewitt law from 1893 to 1896. The principal office
of the complainant is in the city of Lexington, in the county of Fayette. It
has one branch in the city of Paris, in the county of Bourbon, and another
in the city of Covington. The bill avers that the revenue act of 1892 violates
the contract between it and the state in the charter and the amendments to
the charter and the contract between it and the state under the Hewitt law.
   The bill further avers that under the revenue act of 1892 the board of valu-
ation and assessment certified to the authorities of the county of Bourbon the
proportion of the franchises found to be taxable by the county of Bourbon
in the year 1893; that thereupon the county of Bourbon caused to be placed
in the hands of James McClure, sheriff of said county, and the collector of
its revenue, the tax bill made out accordingly; that on July 13, 1894, the
complainant filed in the circuit court of Bourbon county (that being a court
of general jurisdiction) its petition against the said county and sheriff, set-
ting forth in said petition, in apt terms, the contract between it and the state
in regard to taxation under the original charter and under the Hewitt law,
claiming that no taxes could be collected from the complainant except in pur-
suance thereof during its charter life, and that the act of November 11, 1892,
was unconstitutional and void, as impairing the obligation of these contracts,
and praying the court to establish these contracts, and to enjoin the said
Bourbon county and McClure, the sheriff, from attempting to collect any
taxes contrary thereto; that, issue having been joined upon the complain-
ant's said suit, a judgment was rendered in the Bourbon circuit court to the
effect that the act of November 11, 1892, did not violate any contract between
the complainant and the state, and judgment was entered accordingly; that
thereupon the complainant appealed from said judgment to the court of
appeals of Kentucky; that in that court its appeal, having come on to be
heard, was argued by counsel, among others, by the attorney general for the
commonwealth of Kentucky on behalf of the commonwealth, who insisted
upon the affirmance of the judgment; but the court adjudged that the judg-
ment of the lower court was erroneous, and remanded the case to the Bourbon
circuit court for a judgment in conformity to its opinion, in which opinion it
was held that the Northern Bank of Kentucky had an irrevocable contract
under the Hewitt act and its charter, which prevented the authorities of the
state or any of its municipal subdivisions from imposing any other tax than
that prescribed in the Hewitt act. The bill concludes as follows: "The
premises considered, the complainant says it has been fully and finally adju-
dicated in proceedings between it and the said Bourbon county (which rep-

resented the commonwealth, and in law all other municipalities deriving power from the commonwealth) that complainant's contract is valid and enforceable, and that the complainant cannot be subjected to any greater rate of taxation than that agreed upon by it under the Hewitt law; if the commonwealth of Kentucky shall be adjudged to have retired from said contract, then to no greater rate of taxation than is provided for under the complainant's charter and amendments."

J. D. Hunt and Humphrey & Davie, for complainant.

W. S. Taylor, Atty. Gen., for Samuel H. Stone, etc., board of valuation and assessment of the state of Kentucky.

John R. Allen, for Fayette county.

W. P. Kimball, for city of Lexington.

W. McD. Shaw, for city of Covington.

Before HARLAN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

TAFT, Circuit Judge (after stating the facts as above). Under the decision already rendered in the case of the Bank of Kentucky against Stone and others, there can be no doubt that, on the case made both in the bill and on the proof, the defendants the board of valuation and assessment and Bourbon county are estopped by the former adjudication from asserting that the complainant bank is liable for any taxes to Bourbon county under the revenue act of 1892, because, as between the complainant and that county, it was adjudicated that the complainant had an irrevocable contract with the commonwealth by which all taxation against it should be limited to the tax provided in the Hewitt act, and that the tax upon the franchise under the revenue act was a violation of such contract.

It is also contended on behalf of the complainant that the other defendants, Fayette county, the city of Lexington, the city of Covington, and the city of Paris, are equally bound by the adjudication against the county of Bourbon. We do not think that this contention can be sustained. The theory seems to be that, as the county of Bourbon is a municipal corporation under the state government, the state is bound by the adjudication against it, and therefore every other subdivision is bound. It seems to us that this would be extending the doctrine of res judicata further than any authority will justify. The argument is based upon the decision of the court of appeals of Kentucky in Franklin County Court v. Deposit Bank of Frankfort, 87 Ky. 382, 9 S. W. 212. In that case the Deposit Bank of Frankfort was seeking to enjoin the county court of Franklin county from levying a tax upon its property in addition to the tax of 50 cents a share upon its stock which its charter provided should be in full of all tax or bonus. It was held that this was a contract which prevented any additional tax in any form upon its property by the state. The court then continued:

"But it is contended that its terms do not bar the county and city from levying and collecting taxes for county and city purposes. In this position counsel clearly overlook the fact that the county and city are integrant parts of the state, and that they cannot levy and collect taxes without the authority of the state conferring that right upon them. So, the absurdity is presented that the state contracts with the appellee, in consideration of its paying fifty cents on each one hundred dollars of its capital stock, to release it of all

tax or bonus (this is the meaning of the language), and at the same time authorizes its local subdivisions to levy and collect other taxes off of the appellee; that is to say, that the state, by its contract with the appellee, deprives itself of the right to levy and collect other taxes off of the appellee, but may, notwithstanding, authorize all of its subdivisions, if the appellee's property were distributed in all of them, to levy and collect other or additional taxes off of it. It seems that it would occur to one at first blush that such a procedure would be a palpable violation of the contract. Under such a contract between individuals, a doubt could not exist. The state, when she makes a contract based upon a valuable consideration, stands upon precisely the same footing."

This decision adjudged two things: First, that the state had power by contract to impose a limitation upon the taxing power, whether exercised by itself or by municipalities in which it might vest the same power; and, second, that the language of the restriction in this case must be construed as intended to limit the whole power, whether exercised by state or with the state's permission by municipalities. The argument of counsel assumes that as the county derives its power to tax from the state, which is all that was decided in the case cited, it is, in levying taxes, the mere agent of the state, and therefore a judgment against the county on a tax question is a judgment against the agent in respect of the business of the principal, and is binding upon the latter as a privy. Indeed, the argument goes further. It assumes that a county is a part of the state government, and therefore a judgment against the county is a judgment in fact against the state. This is applying the doctrines of agency and privity under circumstances to which they have but little application. The source of all political power including the power to tax is in the people of the state. By a constitution they create a state government and a legislature, and confer upon the legislature power to organize local municipal governments, and to give such governments the power to levy taxes in order to discharge their other appointed functions. The municipal governments are entities distinct from the state government, incurring liabilities of their own in no way binding upon the state, and acquiring rights and property in which the state has no property interest. Except where the law makes the municipal government an agent for the state in collecting the state's taxes or in discharging some other state function, there is no relation between the one and the other of principal and agent, as that relation is usually understood in the law. The state may, through its legislative branch, confer upon, and withdraw from, the counties and cities, power of taxation. But, when the power thus conferred is for the benefit of the local community in which it is to be exercised, its exercise is not by an agent for a principal; it is by a quasi independent government, for the benefit of the people within its limits. The legislature, if not restrained by the constitution, may, by contract with individuals, limit its power either to levy taxes itself or to grant the right of taxation to municipalities; and the individual may avail himself of such restriction by resisting taxation in violation thereof either by the state or municipality. But in a controversy between the individual and the municipality as to the restriction, its existence or extent, the latter is contending for the benefit of

itself and its people, not for the state and its people. The taxes it proposes to collect are to be spent, not for the state at large, but for the convenience and benefit of the people within its limits. In seeking by suit to establish its right to tax, therefore, the city or county is not acting as agent for the state, but for itself. Hence the judgment is not binding upon the state as principal.

The only other possible relation of privity of the state to the litigation must grow out of the fact that it involves the validity of a power granted by the state to the city or county; but this does not make the state privy to the judgment. In granting the power, the state did not enter into an enforceable covenant of warranty with the counties and cities that the power as against every individual was valid. Certainly, it cannot be claimed that the state could be vouched in by the county or city as a warrantor of the validity of the power, or, by notice of the pendency of the suit, could be bound conclusively by the subsequent judgment. If the contention of counsel for the complainant is sound, it must follow that the state and all its municipalities, great and small, would, by a judgment in favor of an individual or corporation against a village in a remote county adjudging a limitation upon the taxing power of the state, be estopped to deny the limitation in any future litigation with the same individual or corporation, although no appeal may have been taken to a higher court, and although neither the state nor the other municipalities may have had any notice whatever of the litigation, or any right or opportunity to be heard upon the question decided. We do not decide, because it is not necessary to do so, whether a county or city would be privy to a judgment against the state adjudging a limitation upon the taxing power; but it suffices to say that the question is in some important respects different from the one we have been discussing.

The case of People v. Holladay, 93 Cal. 241, 29 Pac. 54, does not, it seems to us, support the contention of the complainant. In that case the question was of the title to certain property claimed to have been dedicated as a park. The lot was situated in the city of San Francisco, and the city and county of San Francisco brought a suit in ejectment to recover possession of the tract from the defendant, who had obstructed the use of the same by the public, and excluded them therefrom. In this action the city and county were defeated, and a judgment rendered finding that the defendant was the owner of the undivided $^{19}/_{20}$ of land, and his title thereto was quieted as against the city and county. Subsequently, the attorney general, on behalf of the people of the state, on relation of one Bryant, brought another suit raising the same question, and seeking to oust the defendant from the possession of the same tract. It was held that the city and county of San Francisco had the authority to maintain an action for the purpose of preserving the rights of the general public to the use of squares, or land claimed as such, within its limits, and in such action it was authorized to put in issue the alleged rights of the people to such easement; and the state was bound by the result of such litigation, if the same was not collusive. It is unnecessary for us to ex-

press an opinion upon the correctness of this decision, because it can be easily distinguished from the case at bar. The city and county of San Francisco in the former litigation represented the same public which was represented by the state in the case before the court. The controversy was over the public use in the city of land claimed as a public square. It was obvious that the city, county, and state were representing the same interest and the same right with respect to exactly the same subject-matter. In the present case the subject-matter of the former litigation was the taxes due from the complainant bank to Bourbon county,—taxes which were to be expended by Bourbon county for county purposes and for the benefit of the people living in Bourbon county. The subject-matter of the present action which it is sought to conclude by the former action is the taxes due from the complainant bank to the city of Paris, to be expended for the benefit of the people of that city; to the county of Fayette, to be expended for the benefit of the people of Fayette; to the city of Lexington, to be expended for the benefit of the people of Lexington; and to the city of Covington, to be expended for the benefit of the people of the city of Covington. The rights of these various municipal corporations to the taxes claimed grow out of the same revenue act of November, 1892, but the parties and the persons in interest are different.

We have not deemed it necessary to consider another serious objection which might be urged to the use of a decree against Bourbon county to bar the state and other counties, and that is that, in the absence of power to enjoin the state in a suit, it would be difficult to justify the plea against the state of res judicata based on a decree of injunction against a municipality or state agency which does not enjoy the same immunity. To give the decree such an effect would seem to violate the state's exemption from suit. It suffices, however, to place our decision on the ground first above stated.

The fact that the attorney general appeared on behalf of the commonwealth in this litigation when it reached the court of appeals is not a circumstance which could be held to bind the commonwealth and all of its agencies by the litigation. There were a great many tax cases pending before the court at the same time. In some of these cases the commonwealth was a party, and the attorney general was therefore present to argue the question on its behalf in those cases. Even if this had not been the case, the case of Carr v. U. S., 98 U. S. 433, shows that the appearance of the attorney general on behalf of the counties could not bind the state. In the case referred to, the point in controversy was over the title to land of the United States to certain lots in possession of its officers in San Francisco. The United States filed a bill to quiet title to the property. The defendant set up, by way of estoppel, certain judgments in ejectment rendered by the state court at the suit of his grantor against certain officers of the government, who, as its agents, had possession of the lots. In those actions the United States district attorney and additional counsel employed by the secretary of the treasury appeared for the defendants, and the question of title had been the same. It was held that the former judgment was not an estoppel

against the United States.    Mr. Justice Bradley, in delivering the opinion of the court, said:

"It may be contended that the United States consented to have its title determined in these cases, and that such consent was manifested by the employment of the district attorney and additional counsel to aid in the defense. But we do not think that any such inference can be legally deduced from the action of the secretary of the treasury. He may have deemed it prudent to assist the officers who were sued, without intending to waive any of the rights of the government; and, in fact, he had no authority to waive these rights."

The attorney general of the state in these cases, in appearing in the court of appeals of Kentucky for the county of Bourbon, did not intend to waive any rights of the state, and, so far as appeared, he had no authority to do so.    Our conclusion, therefore, is, that the complainant bank cannot, in its controversy with the city of Lexington, Fayette county, the city of Paris, and the city of Covington, and with the board of valuation and assessment so far as concerns the apportionment and certification of the assessment by the board to those municipalities, rely upon or derive any benefit from the decree in the complainant's favor against Bourbon county.

We are thus brought to the question whether, as between the defendants just named and the Northern Bank of Kentucky, the latter has, by virtue of its acceptance of the Hewitt act, an irrevocable contract with the state of Kentucky, by which the taxes to be imposed during its corporate existence upon it shall be limited to those provided in the Hewitt act.    A second and alternative question is presented by the bill of the bank and by the argument of its counsel.    It is contended that, even if the state had the right at any time to withdraw from the contract with the complainant bank entered into by the latter's acceptance of the Hewitt act, there must be restored to the complainant the tax limitation under its charter which it was enjoying when it accepted the terms of the Hewitt act.

The original charter of the bank, granted in 1835, provided that it should pay into the treasury 25 cents a share of stock, which should "be in full of all tax or bonus: provided, that the legislature may increase or diminish the same, but at no time shall the tax exceed fifty cents on each" share of stock.    In 1836 the legislature increased the tax to 50 cents a share.    In 1838 this was held by the court of appeals of Kentucky to be an irrevocable contract between the bank and the state, preventing the state from taxing the property of the bank or its stock either against the bank or against its holders.    Johnson v. Com., 7 Dana, 339.    In 1869 it was held by the same court that the same contract in another charter prevented taxation of the bank by counties and cities.    Farmers' Bank of Kentucky v. Com., 6 Bush. 127.    These decisions never have been overruled.    Manifestly, if the limitation was continued in extensions of the charter, it was broad enough to prevent taxation by the counties and cities, defendants in this case, under the revenue act of 1892.    The original charter of the bank expired May 1, 1865.    By an act approved February 15, 1858, the chartered privileges and rights of the president, directors, and company of the Northern Bank

of Kentucky were continued in force for 20 years from the 1st day of May, 1865. The extension was granted subject to certain restrictions on the powers of the bank not contained in the original charter, and imposed on it the obligation to establish certain branches. In 1882 the legislature passed an act to extend the charter of the bank for 20 years from May 1, 1885. That act contained this clause:

"Sec. 3. The general assembly of the commonwealth of Kentucky hereby reserves to itself the right to alter, change, amend or repeal this act, and the charter and amendments thereto extending this act at its pleasure."

This act was not accepted by the bank in accordance with its terms. Two years later .another act was passed, which read as follows:

"Section 1. That the chartered rights and privileges of the president, directors and company of the Northern Bank of Kentucky shall continue and be extended in full force for twenty years from and after the first day of May, one thousand and eight hundred and eighty-five.

"Sec. 2. That said bank, under the continuance and extension hereby granted, shall be subject to all the restrictions, limitations, penalties, conditions and duties, and be entitled to all the rights granted to and imposed upon it by the act of its incorporation, and the acts amendatory of or relating thereto.

"Sec. 3. Said bank may be known by, and sue and be sued, contract and be contracted with, by and under the name of the' Northern Bank of Kentucky, as fully as by and under its present name.

"Sec..4. This act shall go into effect when it shall be approved by the stockholders of said bank at their regular annual meeting, or at a called meeting ordered for that purpose by the president and directors of said board, at which called meeting a majority in interest of said stockholders shall be present. Notice of said approval shall be given by the president of the bank to the governor of this commonwealth."

The question is whether this act is to be construed and read with the act of 1856 as a part of it. The act of 1856 read as follows:

"Section 1. That all charters and grants of or to corporations, or amendments thereof, and all other statutes, shall be subject to amendment or repeal at the will of the legislature, unless a contrary intent be therein plainly expressed: provided, that whilst privileges and franchises so granted may be changed or repealed, no amendment or repeal shall impair other rights previously vested.

"Sec. 2. That when any corporation shall expire or be dissolved, or its corporate rights and privileges shall cease by reason of a repeal of its charter, or otherwise, and no different provision is made by law, all its works and property, and all debts payable to it, shall be subject to the payment of debts owing by it, and then to distribution among the members according to their respective interests; and such corporation may sue and be sued as before, for the purpose of settlement and distribution as aforesaid.

"Sec. 3. That the provisions of this act shall only apply to charters and acts of incorporations to be granted hereafter; and that this act shall take effect from its passage."

The court of appeals of Kentucky, in the case of the Franklin County Court v. Deposit Bank of Frankfort (June, 1888) 87 Ky. 382, 9 S. W. 212, held that the act of 1856 did not apply to subsequent acts extending charters granted before its passage, and that the exemption from further taxation was as inviolable under the extended charter as it was during the life of the original charter. But in the case of Deposit Bank of Owensboro v. Daviess Co. (Ky.; March, 1897) 39 S. W. 1030, a majority of the court of appeals ex-

pressly overruled the decision in Franklin County Court v. Deposit Bank of Frankfort, and held that the act of 1856 must be read into all charter extensions granted after its passage, whether the original charter was granted before the act of 1856 or not. It is said that the last ruling was obiter dictum, and unnecessary in deciding the case before the court. But this is by no means clear. In the latter case the question involved the construction of the Hewitt act. In all discussions of that act it had been supposed to be a material preliminary step to determine whether there were any banks which would surrender an irrevocable tax exemption privilege in accepting the terms of the Hewitt act. We think we must therefore treat the two decisions above cited as conflicting; and, in any event, it is for us now to exercise an independent judgment in the matter. In the earlier decision the court of appeals held that the extension related back to the date of the original charter, and that, therefore, the act of 1856 did not apply, because, by its third section, its application was limited "to charters and acts of incorporations to be granted" thereafter. It was further held that, even if the act of 1856 would apply to extensions of old charters, it did not do so here, because the various provisions of the extension act of 1872 manifested an intention of the legislature, so clear as to be "plainly expressed," that the act of 1856 should not apply. We cannot concur in the view that the act of 1856 did not apply to subsequent extensions of old charters. The purpose of such a reservation act is too clear to be misunderstood. It was to prevent the granting of corporate powers, franchises, or privileges in such a way as to be beyond the control and regulation of the legislature, unless the legislature "plainly expressed" its purpose to reserve the power to alter, amend, or repeal. The reason for the act was the inconvenience experienced from the irrevocable charters theretofore granted. Is it to be supposed that the legislature, in the act of 1856, intended to allow those charters, which had led to the enactment of the law, to be extended without being affected by its restrictive provisions? The first section of the act applies "to all charters and grants of or to corporations or amendments thereof, and all other statutes." The third section limits the application of the act "to charters and acts of incorporations to be granted here after." We think that this extension was a grant to a corporation or an act of incorporation granted after the act of 1856. It seems to us a strained and narrow construction to carry back its date by relation to the time of the original charter. In some senses it is true that the extension merely carries on the same old corporation, giving it additional life; but, within the purpose of the act of 1856 to prevent the granting of irrevocable exemptions, the giving of additional life to such an immunity was a new grant,—a new charter. It is our duty to give effect to this act so as to avoid the evil aimed at by the legislature, and no refined reasoning as to the question whether an extension is the lengthening of an old life, or the granting of a new one, ought to blind us to the palpable intention of the legislature to prevent, except by express words, the future granting of irrevocable powers, privileges, or exceptions.

It is well settled by the supreme court of the United States that tax exemptions are not favored, and are to be given the strictest construction (Trust Co. v. Debolt, 16 How. 435); and it may well follow, as a corollary to these principles, that laws passed by the legislature to prevent irrevocable tax exemptions are to be liberally construed.

The next question is whether there is anything in the act of extension to justify us in holding that there is an intention "plainly expressed" in it to make the rights and privileges therein extended irrevocable. The act of extension under consideration in the case of Franklin County Court v. Deposit Bank of Frankfort, supra, was the first act of extension, which was quite elaborate, and contained many new conditions; but the one we have to consider is a simple extension without new conditions, except that it shall be formally accepted by the bank. We are unable to perceive any plain expression of the intention of the legislature to make the rights and privileges granted irrevocable. They are granted for 20 years, and, without the rule of construction enjoined in the act of 1856, this would be held to imply an intention that they should not be subject to amendment or repeal during that period. But the act of 1856 was passed for the precise purpose of avoiding the usual implication, and of requiring affirmative language to sustain the claim that rights and privileges granted for any length of time could not be revoked before its expiration. Griffin v. Insurance Co., 3 Bush, 592; Cumberland & O. R. Co. v. Barren County Court, 10 Bush, 609. We find no such affirmative language in this act. We cannot attach the significance that counsel do to the passage of two acts extending the charter of the Northern Bank, the one containing an express reservation, and the other enacted two years later omitting it. Each act must be construed as it stands, and, in the absence of something affirmative in the latter act itself to exclude the act of 1856, it is to be treated as part thereof. This conclusion makes it unnecessary for us to consider the soundness of the proposition that, upon repeal of the Hewitt act, those who had surrendered exemptions were entitled to a restoration of them.

We come, then, to the question: Did the Hewitt act confer on the banks accepting it a contractual immunity from taxation incapable of repeal during their corporate existence? The first section of the second article of the Hewitt act provided that shares of stock in state and national banks, and other institutions of loan and discount, and in all corporations required by law to be taxed on their capital stock, should be taxed 75 cents a share, and upon all surplus over and above 10 per cent. on their capital stock the same rate of taxation as was assessed upon real estate, which, it was declared, should be in full of all tax, state, county, and municipal. The fourth and remaining sections of the article we give below:

"Sec. 4. That each of said banks, institutions and corporations, by its proper corporate authority, with the consent of a majority in interest of a quorum of its stockholders, at a regular or called meeting thereof, may give its consent to the levying of said tax, and agree to pay the same as herein provided, and to waive and release all right under the acts of congress or under the charters of the state banks to a different mode or smaller rate of

taxation, which consent or agreement to and with the state of Kentucky shall be evidenced by writing under the seal of such bank and delivered to the governor of this commonwealth; and upon such agreement and consent being delivered, and in consideration thereof, such bank and its shares of stock shall be exempt from all other taxation whatsoever, so long as said tax shall be paid during the corporate existence of such bank.

"Sec. 5. The said banks may take the proceeding authorized by section 4 of this act at any time until the meeting of the next general assembly: provided, they pay the tax provided in section 1 from the passage of this act.

"Sec. 6. This act shall be subject to the provisions of section 8, chapter 68, of the General Statutes.

"Sec. 7. If any bank, state or national, shall refuse or fail to pay the tax imposed by this act, or shall fail or refuse to make the consent and agreement as prescribed in section 4, the shares of stock of such bank, institution or corporation, and its surplus, undivided accumulations and undivided profits, shall be assessed as directed by section 2 of this act, and the same taxes—state, county and municipal—shall be imposed, levied and collected upon the assessed shares, surplus, undivided profits and undivided accumulations as is imposed on the assessed taxable property in the hands of individuals: provided, that nothing herein contained shall be construed as exempting from taxation for county or municipal purposes any real estate or building owned or used by said banks or corporations for conducting their business, but the same may be taxed for county and municipal purposes as other real estate is taxed."

Section 8, chapter 68, of the General Statutes, referred to in section 6, was the above act of 1856.

But for the respect we feel for the judgment of the majority of the court of appeals, deciding the Bank Tax Cases, 97 Ky. 591, 31 S. W. 1013, and the very able opinion of Chief Justice Pryor in support of that judgment, we should have thought that there could be no doubt of the necessary construction of the article of the Hewitt act above quoted. The act of 1856 is incorporated in the article of the Hewitt act above quoted, not merely by a rule of construction enjoined by a preceding legislature, and presumably accepted by the legislature passing the Hewitt act, but the latter legislature has expressly and affirmatively adopted it as part of the article.

It is said, however, that the sixth section was not intended to apply at all to the contract of limited tax exemption contained in the fourth section, but that its purpose is to be found in, and limited to, the desire of the legislature to secure to itself the right to repeal the act before the acceptance of its terms by the banks. The suggestion seems to us utterly inadequate to explain the insertion of the section in the act. All the banks were required to accept the act before the next meeting of the legislature, so that the right to repeal must, in this view, have been limited to the short time remaining of the pending session of the legislature, and the interval when the legislature was not in session. With submission, a construction limiting the reservation clause to so inconsequential a purpose is unreasonable. Since the decision by the supreme court in Bank v. Knoop, 16 How. 369, in 1853, that a state might restrict its taxing power over a corporation by charter provisions in the nature of a contract which was irrevocable, the main object of the clause reserving power in the legislature to alter or repeal charters and acts of incorporation has been to render tax exemption revocable; and it is to miss wholly the significance of such a clause to hold that it has no applica-

tion to a tax limitation, when it is expressly made part of the act declaring such limitation. It would be extremely difficult for a court, bound to follow the decisions of the supreme court of the United States, to hold that a clause of an act expressly reserving in the legislature the right to amend or repeal it does not apply to tax exemptions conferred by the same act. In Tomlinson v. Jessup, 15 Wall. 454, an act of South Carolina provided that every charter or incorporation granted or renewed should at all times be subject to amendment, alteration, or repeal, unless the granting or renewing act should in express terms provide otherwise. The question was whether this applied to a tax exemption of the property of a company which was in terms to last during the continuance of the existing charter. The supreme court held that it did. Mr. Justice Field said, in delivering the opinion of the court:

"There is no subject over which it is of greater moment for the state to preserve its power than that of taxation. It has, nevertheless, been held by this court, not, however, without occasional earnest dissent from a minority, that the power of taxation over particular parcels of property, or over property of particular persons or corporations, may be surrendered by one legislative body, so as to bind its successors and the state. * * * In these cases, and in others of a similar character, the exemption is upheld as being made upon considerations moving to the state which give to the transaction the character of a contract. It is thus that it is brought within the protection of the federal constitution. In the case of a corporation, the exemption, if originally made in the act of incorporation, is supported upon the consideration of the duties and liabilities which the corporators assume by accepting the charter. When made, as in the present case, by an amendment of the charter, it is supported upon the consideration of the greater efficiency with which the corporation will thus be enabled to discharge the duties originally assumed by the corporators·to the public, or of the greater facility with which it will support its liabilities and carry out the purposes of its creation. Immunity from taxation, constituting in these cases a part of the contract with the government, is, by the reservation of power such as is contained in the law of 1841, subject to be revoked equally with any other provision of the charter whenever the legislature may deem it expedient for the public interests that the revocation shall be made. The reservation affects the entire relation between the state and the corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the state. Rights acquired by third parties, and which have become vested under the charter, in the legitimate exercise of its powers, stand upon a different footing; but of such rights it is unnecessary to speak here. The state only asserts in the present case the power under the reservation to modify its own contract with the corporators. It does not contend for a power to revoke the contracts of the corporation with other parties, or to impair any vested rights thereby acquired."

The "reservation" clause has been applied to tax exemption privileges in accordance with the doctrine above declared in Atlantic & G. R. Co. v. Georgia, 98 U. S. 359, and Hoge v. Railroad Co., 99 U. S. 348.

The court of appeals of Kentucky in the Bank Tax Cases relied much on the case of New Jersey v. Yard, 95 U. S. 104. In that case the question was whether a tax exemption was subject to repeal under a general reservation act. The railroad company which was claiming the exemption had been organized in 1835, before the passage of the reservation act. A supplement was passed expressly reserving the power of repeal. A second supplement without any

reservation was passed. This second supplement related to a tax controversy, and provided for a settlement of it by written acceptance by the railroad company. It was held that the general reservation act did not apply to a limited tax exemption granted to the company in this supplement. The court pointed out that general acts of reservation passed by one legislature are binding on a subsequent legislature only so far as it chooses to conform to them, and that it is a question in every case whether the legislature making a contract intends the former reservation act to become by implication a part of the contract. In the case before the court it was held that the provision for specific rate of taxation was inconsistent with such an implication, because there was a fair adjustment of a subject of dispute for a valuable consideration on both sides, because the contract assumed the shape of a formal written contract, and because of the scope of the words of the contract, which were that "this tax shall be in lieu and satisfaction of all other taxation or imposition whatsoever by or under the authority of this state or any law thereof." Were it not for the sixth section of the Hewitt act, the case would have a most important bearing in considering whether the legislature passing the Hewitt act intended that the act of 1856 should be incorporated by implication in the Hewitt act. But that which was a matter of inference and argument in New Jersey v. Yard is in the case before us determined by the express declaration of the legislature passing the Hewitt act. Those circumstances and that language of the act under consideration which were regarded in the Yard Case as inconsistent with an implication that the general reservation act should be read into it cannot prevail against the express direction by the legislature that the reservation act must be applied to it. It is, as the supreme court declares it to be, only a question of legislative intention; and, when the intention is expressly declared, there is no room for implication.

The fourth section of the Hewitt act, construed in the light of the reserved power of repeal in the sixth section, was a proposal to the banks that they should pay a certain tax, and no more, during their corporate existence, unless the legislature should see fit sooner to withdraw from the agreement. The question is asked why the old banks should surrender their charter right to a lower tax assessment for the rate fixed under the Hewitt act if it is true that the legislature could withdraw from it at pleasure. It is a sufficient answer to say that they had in fact no irrevocable exemption to surrender; and though they claimed it, and had then the decision of a state circuit court upholding the claim, it was so doubtful that they preferred to accept a somewhat higher rate of taxation by the state alone than to run the risk of being subjected to the much heavier taxation, both state and local, imposed by the seventh section of the Hewitt act upon banks which should not accept the proposal of the fourth section.

Having concluded that the act of 1856 must be applied to the fourth section, the question remained whether the tax exemption, after acceptance by the banks, was a "right previously vested"

within the proviso of that act. If so, it cannot be impaired. The court of appeals held that it was such a right. We cannot concur in this view. It seems to us that the legislature in this proviso was merely expressing in words the limitation that always exists upon the reserved power of amendment or repeal of corporate charters. A legislature cannot, by amendment or repeal of a charter, deprive the members of a corporation of the property or contract rights it has acquired by the exercise of its corporate powers. Com. v. Essex Co., 13 Gray, 239; Miller v. State, 15 Wall. 478; Sage v. Dillard, 15 B. Mon. 349; Holyoke Co. v. Lyman, 15 Wall. 500. It cannot annul contracts made by the corporation with third persons in the exercise of its lawful franchises. It cannot undo that which is done. It cannot say that that does not exist which does in fact exist. It cannot recall an executed grant of property. But it can revoke for the future anything in the charter of a promissory character, whether it is contractual or merely gratuitous. In Greenwood v. Freight Co., 105 U. S. 13, 19, the question was of the effect of the repeal of an act conferring a charter upon a street-railway company that had built its track in the streets. Mr. Justice Miller, speaking for the court, said:

"If the essence of the grant of the charter be to operate a railroad and to use the streets of the city for that purpose, it can no longer so use the streets of the city, and no longer exercise the franchise of running a railroad in the city. In short, whatever power is dependent solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the state, is abrogated by the repeal of the law which granted these special rights."

See, also, Miller v. Railroad Co., 21 Barb. 513; Zabriskie v. Railroad Co., 18 N. J. Eq. 178; Railroad Co. v. Veazie, 39 Me. 571; Hawthorne v. Calef, 2 Wall. 10-24; Com. v. Essex Co., 13 Gray, 239.

The limited tax exemption under the Hewitt act was a contract between the bank and the state. The reserved right to repeal made the contract one which the state could revoke at pleasure. The court of appeals, in the Bank Tax Cases, relied on Commissioners of Sinking Fund v. Green & B. R. Nav. Co., 79 Ky. 73. In that case it was decided that the legislature could not, under the act of 1856, take from the navigation company, without making compensation therefor, the right it had acquired under a contract with the state to take for a term of years tolls from vessels navigating the Green and Barren rivers, in consideration of its agreement, then fully performed, to put in repair, and maintain at its own expense, the line of navigation. It may be hard to reconcile this case with Greenwood v. Freight Co., but it can be distinguished from the case at bar. In the case cited, the court treated the right which the state proposed to exercise as a reserved right of rescission, and held that it could only be exercised on condition that the grantee of the state should receive compensation for the money advanced to improve the property of the state the use of which he was not permitted to enjoy. In the case at bar, the banks surrendered nothing of value to the state for the limited tax exemption of the Hewitt act, and the power of revocation was not in any view, therefore, trammeled by conditions.

In view of our conclusion that the complainant has not established, as against any of the defendants except Bourbon county, the existence of an irrevocable contract of tax exemption, either by res judicata or on the merits, and as this issue thus presented and decided is the only one upon which complainant, a corporate citizen of Kentucky, can ask a federal court for relief, we do not pass upon or decide the question raised by complainant under the state decisions whether prior decisions of the court of appeals, though now overruled, prevent the collection of taxes accruing during those years when the prior decisions holding them uncollectible and void remained unreversed. For the reasons given, the order of the court will be that the motion for an injunction against Bourbon county and the certification of the assessment to it by the board of valuation is granted, and to this extent the demurrers to the bills are overruled; but, as to the certifications of the assessment to the other municipalities, the demurrers are sustained, and the bill dismissed.